IN THE MATTER OF THE PROOF OF THE PAPER WRITING PURPORTING TO BE THE LAST WILL AND TESTAMENT OF GEORGE MILLER, deceased, bearing date the twenty-seventh day of December, 1887.

1. WILLS—TESTAMENTARY CAPACITY.

The burden of showing an unsound mind in a testator rests on the party contesting the validity of the will, and the testimony must relate to the time of its execution; but, if insanity is once clearly established, the burden shifts, and the testamentary capacity at the time of making the will must be shown by a preponderance of the evidence.

2. WILLS—"TESTAMENTARY CAPACITY"—INSANE DELUSIONS.

In determining "testamentary capacity", the question is whether, at the precise time of making the will, he was of sound and disposing mind and memory, that is, capable of exercising thought, judgment, and reflection; and if he knew how he was disposing of his property, what he was about, and had memory and judgment, his will cannot be invalidated, the degree of mind or memory or the wisdom of the dispositions not counting, nor even delusions, unless the will was a direct offspring therefrom.

3. EVIDENCE—OPINION EVIDENCE—SANITY.

The law makes a distinction between the subscribing witnesses to a will, who may testify to their opinion of the soundness of mind of the testator, and all other witnesses, including medical men, who must testify as to facts, and, if allowed to give their opinions, must base them on such facts; but, if it is shown that a subscribing witness did not pay any attention to the testator, or conditions were such that he had no opportunity, his evidence is no more important than the others.

4. WILLS—TESTAMENTARY CAPACITY—SUICIDE.

Neither from attempted suicide before the making of a will, nor the completed act afterward, does the law draw any inference of insanity; it being but a fact, among others, to be considered by the jury.

5. WILLS—TESTAMENTARY CAPACITY—"LUCID INTERVAL"—EVIDENCE.

A "lucid interval" is not merely a cessation of the violent symptoms of an insane disorder, but a restoration of the mind sufficiently to have a sound and disposing mind and testamentary capacity, and the evidence to show a lucid interval should be as strong as that to show insanity.

(*January* 26, 1912.)

PENNEWILL, C. J., and BOYCE and RICE, J. J., sitting.
*Willard Saulsbury* and *Hugh M. Morris* for caveators.
*Benjamin Nields* and *John P. Nields* for respondents.
Superior Court, New Castle County, January Term, 1912.

Probate of the will of George Miller, deceased. William H. Miller and another oppose probate. Probate allowed.

An issue, directed by the court, on an appeal from the decree of the Register of Wills, for New Castle County, probating the will of George Miller, deceased. (No. 49, November Term, 1910— No. 67, September Term, 1910.)

The proceeding before the Register arose on a caveat opposing the probate of the said will, bearing date the twenty-seventh day of December, A. D. 1887.

John H. Danby was the only living attesting witness to the will. When asked, as to the best of his knowledge was George Miller of sound and disposing mind and memory, his answer was: "I believed he was, yes." He later testified: "If I had known at the time what I found out very soon after I witnessed that will, I wouldn't have witnessed the will."

It clearly appeared that the legal business of George Miller, except the writing of his will, was transacted by the late Victor du Pont and Willard Saulsbury. Robert C. Fraim, who wrote the will and was named an executor therein, went with Miller to the Union Bank where the will was executed and did the talking.

George Miller was an excellent mechanic, and acted as a foreman in the shops of the E. I. du Pont de Nemours Company until the latter part of the year 1886. He became from about

1880 a very excitable, eccentric, impulsive and irritable person, and could not very well stand contradiction or opposition. During the last few years when working in the du Pont shops he sometimes acted in a very peculiar and unaccountable manner. He would throw his hands, curse and talk to himself when at work, and often curse other workmen without apparent cause. One of the workmen witnesses said he jumped, flared around and cursed everybody, that he talked about signs the people were throwing to some lady, and acted like a crazy man, and accused one of flirting with a certain woman and another of being about his place at night, and threatened both of them.

He lived with his brother, William Henry, for about nine years, and until August, 1886, when falling out with Henry, he went to live with his brother John S. Both testified that George was crazy for three or four years before he went to California the first time in December, 1886. John said while living with him "he would write wills by the day and throw them away"; he would ponder over a deaf and dumb alphabet hour after hour; sometimes when talking with him in the presence of my brother —if I would move my legs or arms he would jump up and curse me claiming that I was making signs. I have found him standing more than once in my bedroom at midnight with a revolver in his hand. I have known him to get up at midnight and go over to my brother Henry's hunting for some supposed person who was in company with this woman (meaning his niece Jennie, daughter of Henry). He was off on signs and motions about Jennie. He would have hallucinations. He was crazy. If you agreed with these fool notions of his about Jennie he would do anything you wanted him to do, but if you did not he would not speak to you. She was the one he always talked about in these hallucinations; he was terribly interested in her and terribly afraid some accident would befall her. His condition and habits continued all the four months he was with us and while he lived with Henry we had the same trouble with him for years. He had a sun stroke in Cuba when he was a young man. He was foreman in the du Pont shops when he came to live with me, and transacted his own business, made his own deposits and wrote his

own checks before going to California in 1886. William Henry said his brother George was always rather irritable, and would not sit at table when company came. Toward the last he could not manage his affairs in the shop; would quarrel with the men, and stand and look around for hours, "but his money affairs I would not like to say much about because he used to talk to me a good deal about those things and tell me everything he done." They were in Mr. Saulsbury's and Mr. du Pont's hands, and he would only do such things as they sanctioned him to do. I knew that from his own mouth. He and I would often have a little argument between ourselves and he would always make me go to those gentlemen to have them written out. Witness thought the habit of studying a deaf and dumb alphabet was evidence of insanity. George had tied his (Henry's) door at night and had made him look under the lounge and for people outside. I know he liked Jennie. "He was queer from 1880 to 1886. For nine months I lived in purgatory. It was all on account of this girl here. We told him over and over again that he was going crazy. He said, 'did you ever hear of a crazy Miller?' If the boys going up and down the road would whistle, or the women folks shake the table cloth he would say it was a sign, and go around at a terrible rate, especially if the girl here would do it." He was jealous of other people coming around there after her. He would sometimes come in my room when I was in bed with a revolver in his hand, and my wife would say something to him and he would leave. He was always looking for some one, afraid of some one, or imagining some one was after him, and we could not convince him to the contrary. George and I were the fastest two brothers there were in the town. He wrote me some letters from the asylum, and he wrote me some before he went to the asylum, which were nice and affectionate letters. Other witnesses testified respecting the strange actions and peculiar condition of the testator before he went to California in 1886, from which it appears that he believed the common acts of others were signs intended to attract the attention of Jennie; that he would threaten to shoot when he had no revolver; would be out with a revolver until midnight or after, and imagined that some one was after

him or Jennie. He would at times go around with bowed head talking to himself. On one occasion he became angry because a boy's cap was pulled down over his face, and on another occasion when it was snowing and he was about to leave for California, said the boys up the creek would throw flour over him.

*Alfred I. du Pont*, called as a witness in support of the will, testified that George Miller was a foreman mechanic in the shops and the witness was in almost daily communication with him as assistant superintendent of the powder works, from 1884 till he left late in 1886. Had known him since witness was a little boy. He never knew a better machinist. He carried on his business in a normal manner. He had conversations and dealings with him in relation to his business.

*Thomas J. Sterling* testified that he knew George Miller more intimately than a brother for many years. He at times saw George in the shops, when he was working; they were frequently together at theatres, political meetings and gatherings. He was sometimes very irritable and would get mad, but would soon get over such spells. In 1886 about the time Mrs. Deer (Jennie) was going to boarding school, and shortly before George went to California, he told me he intended to make a will and also to leave the majority of that will to Jennie Miller, and intended her to be the richest Miller in the State of Delaware; and said, "I expect there will be some trouble about this will, and if you are living at that time, come up and testify that is the way I intended to make the will." He hadn't made any will at that time. He was thinking about making one.

Several witnesses who knew George Miller, and had seen and talked with him at various times up till he went to California in 1886, and some of whom had business with him at the shop in connection with machinery also testified. Those who testified for the caveators believed him incapable of making a will while those who testified in support of the will believed him capable of making a will.

*Jennie Deer*, niece and the chief beneficiary under the will, testified that she saw her uncle George every day while he lived with her father and mother. She was at school when he went to

California the first time, having started to school in September, 1886. Her uncle George came to see her often when she was at school at Bridgeton, N. J. She was at school about four months. My mother and I were the ones who waited on my uncle, and I was the one he ever took out with him walking and driving until I went to school. He was employed at du Pont's machine shop and my father kept the time of the employees every day up until the last of the month. He kept it in a little paper, and at the end of the month he wrote that off for Uncle George and he made up the men's monthly time. That is what they paid the men off from, the time sheet that Uncle George made up. He made that the last night in every month. I was right there, but I never helped any more than getting his paper and ink, and everything like that, ready for him. He taught my brother then to keep the books and my brother taught my husband. After he left our house he used to stop in every morning to see us, coming from John's before he would go to work. He always said that I was the one who was to have his money. Always did so. He always said he would leave me well fixed. I never knew of his giving any trouble while living at our house, such as tying the doors, jumping out the window, complaining about the croaking of frogs, the shaking of table cloths or napkins. Never heard of such things till I heard them here. He did not object to my going with others—only wanted me to pick my company and not go with the Creek boys. After he left the shop he came to our house only once before I went to school, and he drove me to Coates-ville. I was not afraid of Uncle George and nobody else was. I never went to Aunt Maria Kirk's during the time he was staying there. Never went there in my life.

It appears that on the twenty-second day of November, five days before the will was made, that William H. and John S. Miller joined with their brother George in a deed conveying, for the sum of seven hundred and forty-three dollars and seventy-five cents, a lot of land in Wilmington to David Fox; and also on the twentieth of February, 1886, in a deed conveying for the sum of two thousand three hundred and five dollars, a lot of land in said city to George W. Beckley; and that William H.,

by deed dated September 6, 1886, conveyed to George for the sum of one thousand two hundred dollars, the one-third part of the interest of William H. in a tract of land in Brandywine Hundred, containing thirty acres.   It further appears that George, on September 17, 1887, satisfied a mortgage which he held against David B. Ferris for eight thousand dollars, which mortgage was given on November 3, 1886.

*John S. Miller* testified that Mr. and Mrs. J. Windle Wood wrote George letters urging him to come to California and bring all the money he could get with him.   They were instrumental in getting him to go to California.   When he made up his mind to go he got Harry Richards, my son-in-law, to buy his ticket. George started to California on December 9, 1886, and on the second day out he attempted to commit suicide by cutting his throat with a small pen knife while in the toilet room of the car, the door of which he had locked.   He cut his throat about two inches, but failed to finish the job, because the knife was so dull.   When they tried to force open the door George jumped out of the window while the train was in rapid motion.   He ran about two miles and brought up in a stable where he was discovered by the people of the place who took care of him.   He refused to tell them his name or residence, and was taken to a nearby town and given up to the authorities.   When he found he could not get off, he referred them to Victor du Pont who was notified.   I went out and when he first saw me at the hotel where he was confined there was a dozen men sitting around, and he said: "By God, there is our Jack.   He will make you fellows stand around."   I asked him why he did this trick and he said, "Jack, I thought every man in that train was a detective, and that they were after me, and that they were going to arrest me."   I stayed with him about a month and got him from there to Kansas City and from there sent him on to Los Angeles, California. I bought a ticket for him, placed him in charge of the porter of the Pullman car and returned home.

He came back from California in June, 1887, bringing with him a niece, May Walker, daughter of a sister, about ten or twelve years old.   Mr. Walker came on with him from Kansas.   His

two brothers, John S. and William H. testified that after he returned from California in 1887 he regarded them as his enemies and would not visit them, talk to them or have anything to do with them. He was altogether changed in his feelings towards them who had been his best friends before. Neither they nor their wives had any relations or conversations with him at any time after his return. The testimony respecting George's mental condition from the time John left him at Kansas City till the time the will was made, is briefly as follows: Lewis M. Miller said George would not go among strangers. He got queer. He would go to see my father and would get irritated and mad at almost anything. Before he was a perfect gentleman. He showed that he was lacking of mind. It might be that in fifteen minutes he would change his entire method without saying anything. This was all the time he was at Mr. Kirk's. He seemed to be afraid all the time. I guess he could exercise thought. The last time he went to California he got me to go to the office with him to get his ticket. He attended to getting his ticket and getting a stop over. I checked his trunk. Mary Walker went with him. He bought a ticket for her.

*Sarah Watson.*—Saw George many times when he was staying at the Kirk's. He stayed at my home at times. He was restless and nervous and talked very strange. He seemed to have turned on all his people. He spoke about seeing signs, and many little things that were done he would say were signs. He was altogether different from what he was before,—changed for the worse. I know he was not sound. He would walk backwards and forwards and talk to himself. He told me about his attempt to commit suicide, and said there was some one after him, and it seemed as if he was driven to it. He could talk on some subjects sensibly enough. He had a disease of the brain. I suppose he could think and form a judgment about things.

*Robert Miller* testified that George was a nervous, quick-spoken man when he saw him at Mrs. Watson's. That was about all.

*Sarah Jane Newlin,* Sister—Eighty years of age. George made me a visit the year he came back from California. I think

Statement of Evidence.

it was in August.   When he came the first thing he said was:
"Sister Sallie, here is your crazy brother come to pay you a
visit."   He was with me nine weeks anyway, and till December.
His actions were not like they were before that.   He acted differ-
ently altogether.   He always seemed as if there was something
after him, or that he was afraid of something, and did not talk
much, and wanted to be alone.   He would go out in the lane on
moonlight nights after the family had gone to bed, and would be
wringing his hands and crying when I would go to see him to
coax him to come in.   Sometimes I could not get him to come in,
and he would say if he did he would cry all night and could not
sleep.   Sometimes out as late as twelve o'clock, but he would never
go outside the door if it was dark.   He never read any, although
he was a great reader before.   He seemed to think the two boys
John and Henry were his enemies.   Gave no reason, just had that
feeling towards all his people I think.   Mary Walker was with
him, and he did not seem to want her to go to see his brothers'
families.   He told me he went into John Miller's bedroom and
took a revolver with the intention of shooting himself, and he
said that there was a good angel on one side, and that was his
mother, and a little devil on the other, and the demon told him
to do it, and the other one begged him not to do it.   Just this
good angel that saved him, his mother.   He showed me the scar
when he attempted to commit suicide.   He didn't talk to me like
an uncle ought to talk about his niece Jennie, but more like a
lover.   Said she was much nicer than any of the rest, and that she
acted with signs.   She acted more gracefully than any one he
knew.   It was not her fault.   She was an innocent little girl.   He
would start conversations and never finish them.   Went to Maria
Kirk's from my place.

   *Jane Deer:*—"He came to my home the day he made the will,
and he told me, he says, 'Jennie, Uncle George has fixed every-
thing for you today,' and he says, 'I have made a will.'   I didn't
say anything to him, or ask him how, but he says, 'I have
clinched it, and I have double clinched it, and John S. or no
other Miller will take that away from you!'   I never said aye,
yes or no.   After he returned from California in 1887 I believe

I saw him every day and sometimes twice a day, only when he was in Coatesville. He would often bring me something, and the second time he came he gave me money to buy fruits to do all my preserving. That was after I was married. Gave me a Christmas present in 1887, a twenty dollar gold piece. I think it was about February he left for California again. The Millers were not a very social family. There were six or seven years when my father never spoke to John S. Miller, and had not been visiting Uncle John, and had not been at his home for six years before Uncle George died.''

*Wm. H. Deer*:—Talked with George Miller many times in 1887 on various subjects—his trips to California, mechanics, processes of various nature, and particularly about the finishing of cotton—the business I was engaged in at Bancrofts. He explained to me a short and simple way of getting the capacity of a cylinder and said it would save a lot of figuring. I have always kept it and found it a very quick method for determining results of that kind. He was at our home often, and sometimes stayed all night. He was there as late in 1887 as the latter part of December. I thought he was a very intelligent man, and never noticed anything wrong.

*Daniel Fisher*, powder maker—worked for du Pont Company —knew George Miller when he went to California in 1886, and many years before. Saw him after he returned from California, and talked with him once I remember for fifteen or twenty minutes. I certainly knew him well. He was all the time the same George Miller to me. I never saw any change in the man. He was always the same except sometimes when he would get off a little—that is, get a little worked up—excited. I heard the woman say he was crazy. I never saw any craziness in the man, or any other thing the matter with him. I never saw anything peculiar, only he would get off that quick, and then it was all over. He never tried to control his passions.

In February, 1888, George Miller returned to California unaccompanied by any one except the little girl Mary Walker, who was returning to her home in Kansas. One witness sat at a table with him during a meal while he was at his sister's in Cali-

fornia; he did not say anything, but looked at her in a peculiar way.

*John S.* testified that Dr. Lowry, who attended George after he attempted to commit suicide, told him George's mental condition would never be any better but would grow worse. Dr. Powell was called by William H. Miller to examine his daughter Jennie. He thought Miller suffering from delusions and hallucinations concerning his niece Jennie.

*Dr. Springer* testified as an expert, and, basing his opinion upon the testimony given in the case and which he had read, thought George Miller insane and incapable of making a will.

George Miller was in September, 1890, adjudged insane by the Supreme Court of Los Angeles County, California, and ordered to be confined in the Stockton State Asylum for the insane. On the nineteenth day of December, 1890, a guardian and trustee was appointed by said court of the estate of said George Miller insane. He was confined in said asylum until his death in 1910. Certain letters were written to his brother while he was in the asylum and also shortly before, which indicated that he was of unsound mind at the time.

PENNEWILL, C. J., charging the jury:

Gentlemen of the jury:—This is a case in which the validity of an alleged will is contested. The court has seen fit to direct an issue to be tried by a jury in order the better to determine the question they must decide.

The caveators, or contestants, are William H. Miller and John S. Miller, brothers of the testator, who oppose the probate of a certain paper writing as the will of their brother George Miller, on the ground that at the time of the execution of said paper writing George Miller did not have testamentary capacity. They contend, generally, that he was at the time of unsound mind, and in particular, that he was then laboring under insane delusions both with respect to his said two brothers, and also with respect to his niece Jennie, who is a daughter of William H. Miller, and the chief beneficiary under the alleged will.

We will not undertake to state the testimony. The alleged will, and certain other papers, letters and legal instruments are

in evidence, marked as exhibits, and you will have them with you when you retire to your room.

All the other evidence, consisting of the testimony of many witnesses, you must remember as best you can, and we have no doubt your recollection will be good and true, because you have been remarkably attentive during the progress of the case for several days.

George Miller, the testator, was never married. He was born in New Castle County in the year 1836, and went to Cuba as a mechanic when a young man and remained there for several years. When he returned to this state he lived with his father and mother till they died, and later resided with his brother William H. for about nine years. He left there in August, 1886, and went to his brother John's where he remained until he started for California in December, 1886. He began working as a mechanic at the Du Pont De Nemour Powder Mills about 1867, and continued to work there till a short time before he left for California. A day or two after he started West he attempted to commit suicide by cutting his throat with a knife, and jumping from a rapidly moving train on his journey. His brother John S. having received information of such occurrence went West and remained with his brother until he had sufficiently recovered to resume his journey to California. He remained in that state at the home of John Wendell Wood for about six months when he returned to this state, and stayed for a short time at the Clayton House in Wilmington. After that he resided with certain female relations until he returned to California in the latter part of January or the first part of February, 1888.

He executed his alleged will December 27, 1887, before he started for California the second time. After returning to California he lived with the said John Wendell Wood during most of the time until he was adjudged insane and committed to an insane asylum in September in the said state in the year 1890, where he remained continuously until his death on the third day of June, 1909.

The question that you are to determine in this case is whether the paper writing bearing date December 27, 1887, and purporting

to be the last will and testament of George Miller, deceased, is or is not his last will and testament.

[1] Under the law of this state any person of the age of twenty-one years or upwards, being of sound and disposing mind and memory, may make a will. Every person is presumed in law to be of sound mind until the contrary is shown, and the burden of showing an unsound mind in the testator to the satisfaction of the jury by competent evidence rests on the party contesting the validity of the will, and the testimony must relate to the time of its execution.

Testamentary incapacity is not to be presumed, but must be satisfactorily shown to the jury by the preponderance or greater weight of the evidence in the case.

If, however, insanity is once clearly established, the burden shifts, and it devolves on those supporting the will to show, by testimony as strong as that required to establish insanity, that it did not exist at the time the will was made; the burden, however, does not shift until insanity is so established to your satisfaction by a preponderance of the evidence.

[2] In determining the question of testamentary capacity, that is, whether the testator was of sound mind, you must direct your minds to the precise time of the execution of the will. In cases like this courts have been liberal in admitting testimony as to the mental and physical condition of the testator, both before and after the time of the execution of the will; but such testimony is admitted only for the purpose of enlightening your minds, so that you may have the environments of his life, and be able to concentrate your judgment upon the critical moment, and to say in that concentrated light whether at the precise time of the making of the will he was of sound and disposing mind and memory. If he was, then it is a matter of indifference what may have been his condition at any other time. *Ball, Guardian, v. Kane's Executor,* 1 *Penn.* 104, 39 *Atl.* 778.

In the case of *Smith v. Smith's Admr.* 2 *Penn.* 251, 45 *Atl.* 398, this court said: "The law gives a person the right to dispose of his property as he sees fit, and he alone is the judge of how he will dispose of it. You are not to consider whether it is such a

Charge.

will as you would have made, or such a will as you think he ought to have made. If he was possessed of a sound and disposing mind and memory, it was his right to dispose of his property by will as he pleased, and with that disposition you have nothing whatever to do."

There are many varying grades of mental capacity, ranging from weak to strong—from the lowest to the highest degree of intelligence.

Intellectual feebleness alone, or mere weakness of the understanding, whether this condition of the mind be natural or the result of injury, or of disease, does not disqualify a person from making a valid will. A partial failure of mind or memory, that is to say, even a failure of mind or memory to a considerable extent, from whatever cause, is not, in itself, sufficient ground for setting aside a will, if there still remains sufficient mind and memory to enable the testator to comprehend and understand what he is about, or what he is doing. If he is able to understand that he is disposing of his estate by his will, and to whom he is disposing of it, however weak his intellect may be, he is able and competent to make a valid will. And hence the courts never undertake to measure the size, the degree, or the extent, of a man's understanding or capacity; nor do they ever inquire into the wisdom, or the folly, of the dispositions which he may have made of his estate.

The question is not so much as to the degree of mind or memory possessed by the testator, as this: Had he sufficient mind and memory? Had he a disposing mind and memory? Was he capable of recollecting what property he was disposing of, and to whom he was disposing of it? In a word, were his mind and memory sufficiently sound to enable him to know, and understand, the business in which he was engaged, at the time when he executed his will? *Jamison v. Jamison's Will*, 3 *Houst.* 108.

If the jury are of the opinion from the evidence that the testator was capable, at the time he executed his will, of exercising thought, and judgment and reflection—if he knew how he was disposing of his property,—what he was about, and had memory and judgment, his will cannot be invalidated. *Chandler v. Ferris*, 1 *Harr.* 454; *Lodge v. Lodge's Will*, 2 *Houst.* 418.

In the case of *Sutton v. Sutton*, 5 *Harr*. 461, Chief Justice Harrington instructed the jury that testable capacity on the part of the testator amounted to nothing more than a knowledge of what he was about, and how he was disposing of his property, and the purpose so to do it.

In considering and determining the question of capacity, the time when the will was executed is the material point to which the jury must look, to ascertain the state and condition of the testator's mind. For, although he may have been incapable at any time before or after that period, yet, if he had sufficient capacity at the time when the will was executed, his prior or subsequent incapacity amounts to nothing and the will must stand.

[3] It is to the words, the conversations, the appearance, the acts and doings, the conduct and behavior of the testator we are to look to ascertain the state of his mind; they alone are to us the external, visible and natural signs, or indications, of his mental condition. And, therefore, in this case, as in all other cases of like nature, the question of capacity must be determined from the facts and circumstances disclosed and established by the evidence. In examining and weighing that evidence, you will carefully consider the character of the witnesses, for veracity and integrity—their bias and interest, on the one side, or on the other, if any—their intelligence and judgment, and their respective opportunities and powers of observation. And here it is but proper we should say to you that the law makes a distinction between the subscribing witnesses to the will and other witnesses. The subscribing witnesses being placed by the law around the testator, at the time of the execution of his will, for the special purpose, among others, of ascertaining and judging of his capacity, they are permitted to testify as to the opinion they formed at the time, of the condition of his mind—whether it was sound or unsound. And if they are persons of intelligence and veracity their opinions are entitled to great weight with the jury. Other witnesses may testify to his behavior, his conduct and conversations, his appearance, and to particular facts, tending to throw light on the state of his mind, and from which its condition can be fairly inferred, at the time he executed his will, but they can-

not testify to their opinion, merely, of his capacity, without also stating the facts upon which that opinion is founded; and if the facts do not fully and clearly warrant that opinion, the opinion must go for nothing, for it is the fact, and not the opinion, upon which you must rely, in forming your judgment.

The testimony of medical men stands upon the same ground, except that, being more competent to form an opinion upon subjects of this kind, greater weight will in general be given to such opinions. *Jamison v. Jamison's Will*, 3 *Houst.* 108.

Of course the value of the opinion of a subscribing witness, like other witnesses, depends upon the opportunity the witness had to observe and judge the testator's mental condition and capacity at the time the will was executed, and upon his use of such opportunity. If it clearly appears from the testimony that he did not have, or having, did not use, his opportunity of observation, the special value of his opinion ceases, because the peculiar weight given by law to such testimony arises from the witness' opportunity of observation and the probability of his using the opportunity on account of his participation in the transaction.

In the *Kane Will case*, the court said: "In determining the testator's condition at the precise time of the making of the will, the jury should give to the testimony of the subscribing witnesses to the will such credit as their peculiar relations to and opportunities of knowing his condition just then, entitle them. The law places them there to speak to that point."

In the case of *Duffield v. Morris*, 2 *Harr.* 375, the court charged the jury that: "The paper itself (that is, the will) which was before the jury would afford important aid in determining the question of insanity. Are its dispositions in accordance with, or in opposition to, the previously expressed purposes and known affections of the testator? The internal evidence that it affords, with all the circumstances which surrounded it, may be fairly brought to bear on this question; remembering that whilst we are looking into the will itself for evidences of sanity or insanity, we are not to make a will for the testator ourselves, but to let his will be the reason for his act, unless something appear plainly inconsistent with sanity itself, or with his previously expressed and deeply fixed purposes."

It is not denied that George Miller attempted to commit suicide in the manner shown by the testimony about a year before he made his will, and it is contended by the caveators that such act established the fact that the testator was insane at the time. And they further contend, that if insane at that time the law presumes that his insanity continued up to the making of the will, and that the will is therefore invalid, unless it is shown to your satisfaction that he was, at the time the will was made, of sound and disposing mind and memory.

This would be a sound proposition of law if an attempt to commit suicide established the fact of insanity.

Does it establish such fact, or does the law infer insanity from such an act?

Upon this point the court in the *Duffield case* said:

" The day after the execution of this paper, Dr. Morris committed suicide, and this introduces another important question as to what operation and weight this fact ought properly to have in determining the question of sanity or insanity at the time of making the will. This also is a question of fact for the jury, to be determined according to their own view of the nature of the act in general, and in reference to the particular case before them. *  *  *  All the court had to say to them on the subject was that in our opinion the law draws no inference either of sanity or insanity from the fact of suicide itself alone.  *  *  *  The law makes no inference from it.  It stands as a fact, together with all the other acts of the deceased's life, together with his character, situation, habits, thoughts, purposes, principles and affections, so far as these are made known to the jury through the medium of the evidence, from which they are to determine whether the deceased, not merely at the time of committing suicide, but at the time of making his will, was of unsound mind."

In *Koegel v. Egner*, 54 *N. J. Eq.* 623, 35 *Atl.* 394, it was said by the court: " The fact that the testator's mind was so affected as to cause him to attempt suicide, in which he was ultimately successful, is not inconsistent with testamentary capacity.  It is in its very nature transitory, and the proof of the existence of an attempt at suicide, or of the act itself, by no means establishes

Charge.

its existence at an antecedent or subsequent period of time. No presumption of fixed or lasting mental aberration arises upon such proof."

[4] We therefore state this to be the law upon this point: Neither from an attempt at suicide, nor from the completed act, does the law draw any inference of insanity. The proof of such an attempt or act does not establish unsoundness of mind at an antecedent or subsequent period of time. It stands simply as a fact, together with all the other facts shown by the evidence, from which the jury are to determine whether the deceased, at the time of making his will, was of sound or unsound mind.

As we have already said the caveators contend that George Miller was before, and at the time, of making his will laboring under insane delusions with respect both to his said brothers and his niece, and that the will in question is, therefore, invalid..

This court, in the *Duffield case* to which we have referred, in speaking of delusions used the following language:

"A sound mind is one wholly free from delusion, all the intellectual faculties in a certain degree of vigor and harmony; the propensities, affections and passions being under the subordination of the judgment and will, the former being the controlling power, with a just perception of the natural connection or repugnancy of ideas. Weak minds again only differ from strong ones in the extent and power of their faculties.  *  *  *  A perfect capacity is usually tested by this, that the individual talks and discourses rationally and sensibly, and is fully capable of any rational act requiring thought, judgment and reflection. This is the standard of a perfect capacity; but the question is not how well a man can talk or reason, or how much judgment he can display, or with how great propriety and sense he can act; it is only, has he mind and reason, can he talk rationally and sensibly, or has he thought, judgment and reflection? Weakness of mind may exist in many degrees without making a man intestable"  *  *  *

"An unsound mind is marked by delusion; it mingles ideas of imagination with those of sensation, and mistakes one for the other. It is often accompanied by an apparent insensibility to, or

perversion of, those feelings which belong to our nature. Insane delusions consist in the belief of facts which no rational person would have believed. It may sometimes exist on one or two particular subjects, although generally it is accompanied by eccentricity, irritability, violence, suspicion, exaggeration, inconsistency, and other marks and symptoms which may lead to confirm the existence of delusion, and to establish its insane character''
*    *    *

"It is hard to define the invisible line that divides perfect and partial insanity. Each case must rest on its own circumstances.    *    *    *    And this doctrine of partial insanity is applicable to civil cases, if existing at the time of the act done; and will avail to defeat a will, the direct offspring of such partial insanity. But it has been held that a will cannot be set aside on the ground of monomania, unless there be the most decisive evidence, that at the time of making the will, the belief in the testator's mind amounted to insane delusion."

The court in the *Duffield-Morris case* said, in speaking of insane delusions: "This was the great question for the jury to try, whether the testator was the subject of such insane delusions, fancying things which did not exist, and could not exist, and which no reasonable mind could believe to exist; did this delusion (if any existed) continue up to the time of making his will, without intermission at that time, and to such an extent as to exclude thought, judgment and reflection, to deprive him of the power of rational conversation on the matter he was about, and of that kind of knowledge that would enable him to apprehend in his own mind that he was making a will, and the objects and purposes of such an act? If he had this knowledge, memory and judgment, it is what the law means by a sound and disposing mind and memory, which is sufficient to make the will valid, whatever may have been the state of the testator's mind before or after."

We think the law respecting delusions is well settled. It was very clearly and tersely expressed by the court when they said, in the *Duffield case:* "Partial insanity, meaning insane delusion, will avail to defeat a will which is the direct offspring of such partial insanity or insane delusion."

Such is the doctrine now recognized by the courts, not only of this state, but of this country and of England. It is no longer held that the mere existence of a delusion, at the time of the execution of the will, will invalidate the will; and the noted case of *Warring v. Warring* has been long since disregarded and overruled.

In *Redfield on Wills*, 79, cited by the caveators, it is said: "Where the testator is subject to delusions with regard to persons who would be the natural objects of his testamentary bounty, his will made while he is under the influence of such delusions is invalid."

And Theobold in his work on *Wills*, at 14, says: "When the delusion manifestly operated upon the disposition in the will, then the will must be declared void."

In the case of *Orchardson v. Cofield*, 171 *Ill.* 14, 49 *N. E.* 197, 40 *L. R. A.* 256, 63 *Am. St. Rep.* 211, the court, repeating the language used in an earlier case ,said:

"Beyond all question it is within the previous rulings of other courts of the highest respectability that where there is insane delusion in regard to one who is an object of the testator's bounty which causes him to make a will which he would not have made but for that delusion, such will cannot be sustained."

In *Re Segur's Will*, 71 *Vt.* 224, 44 *Atl.* 342, it was held: "If he has an insane delusion in respect to one of his children, or other natural objects of his bounty, and the instrument presented for probate is the product of such insane delusion, it is void because he has not the testamentary capacity the law requires."

The same principle is recognized in other cases cited by the caveators, including *Shaw's Will*, 2 *Redf. Sur.* (*N. Y.*) 107, and *Matter of Dorman*, 5 *Dem. Sur.* (*N. Y.*) 112.

Such being the law, we say to you that the mere fact that a testator had delusions at the time he made his will is not sufficient in itself to invalidate the will.' To have such effect the jury must be satisfied that the will was the direct offspring or product of such delusion, was made under the influence thereof, or the delusion manifestly operated upon the disposition in the will.

The rule is, that if the delusion was not such as to affect the testator's knowledge, memory and understanding of the extent and nature of his estate, the proper objects of his bounty, and the nature of the testamentary act, he has capacity in law to make a will. In the particular case the inquiry should be: Did the testator, notwithstanding the delusion, have a sound and disposing mind and memory at the time he made his will? In the last analysis that is the question the jury must decide, and we have stated as clearly as we can the law that must control you in reaching such decision.

We cannot define or describe to you specifically the symptoms or evidences of insanity or insane delusions, and any attempt to do so would probably confuse rather than assist you. All that we can say, and we think all we should say, is that you must determine from the facts disclosed by the evidence in the case whether George Miller was insane, or laboring under an insane delusion, at the time he made his will; and if you find that he was, you must then determine whether the insanity or delusion was such as would invalidate his will under the law as we have stated it.

[5] We may say that a lucid interval, as the term is used in speaking of lucid intervals of insane persons, is not merely a cessation of the violent symptoms of the disorder, but a restoration of the mind sufficiently to have a sound and disposing mind and testamentary capacity as we have defined it in the course of this charge. The evidence in support of a lucid interval, after derangement has been established, should be as strong and demonstrative of such fact as when the object of such proof is to show insanity.

Because of the importance of this case, we have given you at some length the principles of law respecting testamentary capacity, as declared by the courts of this state; and courts and juries, too, must be governed by that law in determining whether the testator had or had not, at the time he executed his will, testamentary capacity, that is, a sound and disposing mind and memory.

The law respecting testamentary capacity being so well settled in this state, there does not seem to be any necessity or rea-

son for resorting to authorities in other jurisdictions in order to determine whether George Miller was, or was not, of sound and disposing mind and memory at the time he executed his alleged will.   The cases in other jurisdictions are almost innumerable, but after all the general principles declared by the courts in the different states are substantially the same.   Generally, the important and difficult thing is to apply such principles to the facts of the particular case.

In conclusion we will say that the question which you are now called upon to decide lies within a very narrow compass.   It is simply this, whether George Miller on the twenty-seventh day of December, 1887, the time when the will now in issue before you was executed by him, had sufficient mental capacity, that is, mind and memory, to make a valid will; and if you shall be satisfied from the evidence that the mind and memory of the testator at the time when he executed his will was not sufficiently sound to enable him to know and understand what he was about or what he was doing, your verdict should be against the will.   But if, on the contrary, you should be satisfied from the evidence that the mind and memory of the testator, at the time he executed his will, was sufficiently sound to enable him to exercise thought, reflection and judgment and to know and understand what he was about, or what he was doing, then his will should stand, and your verdict should be in favor of its validity.

The jury found the paper writing to be the last will and testament of George Miller, deceased.