IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IMO: | ) | |
| | ) | |
| The ESTATE OF JAMES VINCENT | ) | C.A. No. 7339-ML |
| TIGANI, JR., deceased, and | ) | |
| the J. VINCENT TIGANI, JR., | ) | |
| a/k/a JAMES VINCENT TIGANI, JR. | ) | |
| REVOCABLE TRUST, U/A dtd. | ) | |
| APRIL 10, 1995. | ) | |

MASTER'S REPORT

Draft Report:  September 30, 2015
Exceptions Submitted: January 22, 2016
Final Report: February 12, 2016

Neil Lapinski, Esquire and Phillip A. Giordano, Esquire, of GORDON FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; Attorneys for Mrs. Tigani.

Michael A. Weidinger, Esquire and Alessandra C. Phillips, Esquire, of PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; Attorneys for Bruce W. Tigani.

LEGROW, Master

This case began as Bruce Tigani's bid to remove his mother, Josephine Tigani, as executrix of Bruce's father's estate and as trustee of Bruce's father's trust. The relationship between Bruce and Josephine was strained to its breaking point in the 18 months leading up to the death of Bruce's father, J. Vincent Tigani, Jr. Many years before his death, Mr. Tigani executed a pour-over will and revocable trust that, among other things, designated Bruce and his siblings as residuary beneficiaries of Mr. Tigani's substantial estate. That residual interest, however, was subject to a limited testamentary power of appointment that allowed Mrs. Tigani to designate different beneficiaries by her last will and testament. Seizing upon that power of appointment, Mrs. Tigani attempted quickly to end this litigation by revising her own will and trust to remove Bruce as a beneficiary of his father's trust. As a result of Mrs. Tigani's efforts, this case became side-tracked by issues of standing and testamentary capacity: namely, whether Mrs. Tigani's revisions to her estate plan effectively divest Bruce of standing to maintain this action and, if so, whether Mrs. Tigani had the requisite capacity to execute those documents.

The short answers to those questions are "no" and "yes," respectively. The longer answers, as described below, involve novel legal issues and complicated factual disputes. This case has been hard fought, at times ugly, and – in my view – has little to do with the substantial funds at stake and much more to do with each

1

side attempting to vindicate their own negative opinion and characterization of the other. Although it unfortunately means this difficult case will continue, I conclude that Bruce has standing to pursue this action and that Mrs. Tigani had the capacity to execute the challenged estate documents.

**BACKGROUND**

These are the facts as I find them after trial. Trial took place over four days and covered decades of family history. The following factual recitation includes only those facts I view as relevant to the issues of standing and capacity.

### A. The Tigani family

Josephine C. Tigani ("Mrs. Tigani"), who is the respondent in this action, was married to James Vincent Tigani, Jr. ("Mr. Tigani") for more than 60 years. The couple resided in Delaware for most of their marriage and had three children: James V. Tigani, III ("Jim"),[1] Diane A. Tigani ("Diane"), and Bruce W. Tigani ("Bruce"). Jim is married to Mary Anne Tigani ("Mary Anne"), and they have four children: Jennifer, Allison, Kristin, and James V. Tigani, IV ("Jimmy"). Jim is a dentist in Wilmington. Diane never married and was a school teacher for more than thirty years, until she retired to help her mother and father as they confronted a number of health issues in their later years. Diane lives with Mrs. Tigani, as she did for a number of years before Mr. Tigani's death. Bruce, who is the petitioner

---

[1] Because many of the parties and witnesses share the same last name, I use their first names as necessary for clarity. No disrespect is intended.

2

in this action, was married to his first wife, Janice, until approximately 2008. Bruce and Janice had two children together, Jessica Tigani ("Jessica") and Bruce Tigani, Jr. ("B.J."). Bruce is a lawyer who practices in Wilmington. He is now married to Jennifer Brockett Tigani ("Jennifer").

Although not without their differences and problems over the years, Mr. and Mrs. Tigani and their children shared a generally warm relationship as the children grew up. Once the children were adults, however, rifts began to develop. One significant disagreement between Mrs. Tigani and Jim lasted for more than ten years, during which time Mr. and Mrs. Tigani executed an estate plan disinheriting Jim. The precise origins of this falling out are unclear, but may have involved tensions between Mrs. Tigani and Jim's wife, Mary Anne. With the assistance of Bruce and Mr. Tigani, Mrs. Tigani and Jim ultimately resolved their differences.

Her ten year schism with Jim was not Mrs. Tigani's only family division. She also has not spoken to her sister, Madeline, for several decades, and had, at best, a very distant relationship with her other sister, Virginia. Mr. and Mrs. Tigani also had their differences and disagreements over the years. At times, Mrs. Tigani was very dominating of Mr. Tigani.[2] With all due respect to Mrs. Tigani, the testimony at trial established that she is stubborn, quick-tempered, and controlling

[2] Deposition of James V. Tigani, IV (hereinafter "Jimmy Dep.") at 45-46; Trial Transcript (hereinafter, "Tr.") at 360-61 (Jessica) (testifying Mrs. Tigani was controlling of Mr. Tigani and at times belittled him); *id.* at 1079-80 (Jim) (testifying that he was concerned that his mother was placing undue pressure on his father and therefore directly asked his father whether that was the case).

of her family members, at times.[3] Some, though not all, of her behavior may be attributable to Mrs. Tigani's efforts to protect Mr. Tigani's health and mental state, which sometimes led her to attempt to control those interacting with him.[4] Notwithstanding these traits, Mrs. Tigani maintained a fairly warm relationship with Bruce until around 2008, at which point tensions began to develop in their relationship. Those tensions and the associated fall out form the basis of this action.

## B. Bruce's personal and professional relationship with his father

At trial, all three of Mr. and Mrs. Tigani's children expressed a great deal of love and respect for their father. It is understandable, and plain from these proceedings, that Bruce places tremendous value on the memories he has of his father and their relationship. The witnesses at trial largely were in agreement that Mr. Tigani was close with all three of his children, including Bruce. Bruce's relationship with his father had an additional dynamic, however, because Bruce served as his father's attorney for most of Bruce's legal career.

Shortly after Bruce graduated from law school, he began representing his father in connection with Mr. Tigani's position as a director and stockholder of several family-owned businesses, including Standard Distributing, Wesley Realty,

---

[3] Jimmy Dep. at 16, 22-24, 28-29, 38; Tr. at 371-73 (Jessica); Tr. at 401-04 (B.J.); Tr. at 1083 (Jim) (testifying his mother instructed him not to tell Bruce that Mr. Tigani was in the hospital).
[4] Tr. at 1078-79 (Jim).

4

Tigani Associates, and Tigani Ventures.[5] Bruce and Mr. Tigani discussed his business interests frequently, particularly later in Mr. Tigani's life when issues arose regarding various attempts to buy Mr. Tigani out of the businesses.[6] Mr. Tigani certainly valued Bruce's counsel and was adamant that Bruce remain as his attorney.[7] Even Mrs. Tigani grudgingly concedes that Bruce's advice was more valuable to Mr. Tigani than that of other attorneys whom Mr. Tigani retained late in his life.[8]

### C. The 1995 estate planning documents

After Jim and Mrs. Tigani reconciled their decade-long disagreement, Mr. and Mrs. Tigani executed new estate planning documents. On April 10, 1995, Mr. Tigani executed a will ("Mr. Tigani's Will") that made certain bequests of tangible personal property and otherwise left the residue of his estate to a simultaneously executed revocable trust called the James Vincent Tigani, Jr. Revocable Trust (the "Trust").[9] Mrs. Tigani executed a largely identical will leaving the residue of her estate to the Josephine C. Tigani Revocable Trust ("Mrs. Tigani's Trust").[10] Mr. Tigani designated Mrs. Tigani as executrix of his estate and trustee of the Trust. Mrs. Tigani made similar, reciprocal provisions in her will and the agreement

---

[5] Tr. at 13-14 (Bruce).
[6] *Id*. at 32-35 (Bruce).
[7] *Id*. at 1074-75, 1077 (Jim).
[8] *Id*. at 664-65, 669-70 (Mrs. Tigani).
[9] Petitioner's Exhibit ("PX") 8.
[10] PX 9.

governing her trust. According to the agreement governing Mr. Tigani's Trust (the "Trust Agreement"), the residue of the Trust was to be divided into a marital deduction trust, a marital deduction generation skipping trust, and a residuary trust.[11] Mrs. Tigani was named as the beneficiary of all those separate trusts during her lifetime. As explained in further detail below, the Trust Agreement gave Mrs. Tigani a limited testamentary power of appointment over the assets held in trust.[12] Any property not so appointed was to be divided into three equal shares for Diane, Jim, and Bruce.[13] Mrs. Tigani made similar reciprocal provisions in her trust. In other words, the spouses' collective estate plan established in 1995 left their estates to the surviving spouse for their lifetime, with the residue to be distributed relatively evenly among their children unless the surviving spouse directed otherwise through the exercise of their testamentary power of appointment. The significance of this power of appointment is discussed below.

### D. Mr. Tigani's health begins to fail

Mr. Tigani suffered from various health problems over the course of his lifetime, but in early 2009 he was diagnosed with non-Hodgkin's lymphoma, which successfully was treated with chemotherapy. At the time, Bruce was

---

[11] PX 1 at Article FIRST, Sections B, C. Although technically divided into three trusts, those distinctions are not relevant for purposes of this report. A reference to the "Trust" refers to all three trusts, unless otherwise indicated.

[12] *Id*. at Article FIRST, Section C(2)(d), Section C(3)(c), Section D(3).

[13] *Id*. at Article FIRST, Section E(2). The Trust left Mr. and Mrs. Tigani's home to Diane for her lifetime, subject to certain exceptions. *Id*. Article FIRST, Section E(1).

attentive to his father's medical problems, while also attempting to assist his mother with her own medical appointments.[14] In April 2010, however, Mr. Tigani suffered a blockage in his carotid artery, which triggered a stroke.[15] On April 14, 2010, Mr. Tigani had surgery that successfully removed the blockage.

The following day, Bruce went to visit Mr. Tigani in the hospital's "cardiovascular step-down unit."[16] Bruce insists this visit occurred at Christiana Hospital, while Mrs. Tigani testified it occurred at Wilmington Hospital, and Diane expressed some confusion about where it occurred.[17] Nonetheless, Bruce assisted his father with eating lunch and accompanied him to a physical therapy appointment. When they returned to Mr. Tigani's room, Diane and Mrs. Tigani were waiting there.

Mrs. Tigani testified it was an unseasonably warm day that day, she had to take a circuitous route to Mr. Tigani's room due to hospital construction, and she was tired and in pain by the time she arrived, having recently had a procedure on her spine.[18] There is no other testimony or documentation substantiating Mrs. Tigani's testimony regarding the weather, although Diane testified that Mrs. Tigani

---

[14] Tr. at 22-23, 25-27 (Bruce).
[15] *Id*. at 23-24 (Bruce).
[16] *Id*. at 37-38 (Bruce).
[17] *Id*. at 626, 864 (Mrs. Tigani); Dep. of Diane Tigani at 161-62.
[18] Tr. at 615-18 (Mrs. Tigani).

7

did have to walk a fair distance and was in pain.[19] When they arrived, Bruce retreated to the back of the room to tend to some work, leaving Diane and Mrs. Tigani to visit with Mr. Tigani. The witnesses agree that Mr. Tigani was falling asleep during this visit and that Mrs. Tigani told him that, if he was going to sleep, she might not visit every day because it was hard to get there and caused her substantial pain to walk so far.[20] Mrs. Tigani testified that she said this gently and without anger, largely teasing Mr. Tigani.[21] Diane testified similarly, explaining that Mrs. Tigani was in pain and simply told Mr. Tigani something to the effect of "[I]t was hard for her to come up there, and, you know, if he was going to be sleeping, that he wouldn't even know she was there, you know, she was in a lot of pain and that she might not be able to make it."[22]

Bruce, however, viewed Mrs. Tigani's statements as angry and pestering, and understood Mrs. Tigani to be threatening to leave the hospital and not return because Mr. Tigani could not stay awake while she visited.[23] Bruce therefore "stepped in," telling his mother "[i]f you are going to leave, get the … out," using

---

[19] Dep. of Diane Tigani at 165-66. Mrs. Tigani insists the weather was in the upper 90s, even though records indicate it was in the 70s. Tr. at 801-02. She also insists the last episode of *As The World Turns* was on that day, and she missed it to visit Mr. Tigani, even though records indicate the last episode was not aired that day. Tr. at 803.
[20] Dep. of Diane Tigani at 165-66; Tr. at 39-42 (Bruce); *id*. at 622 (Mrs. Tigani).
[21] Tr. at 621-22.
[22] Dep. of Diane Tigani at 165.
[23] Tr. at 39-40 (Bruce).

an expletive for emphasis.[24]  Bruce acknowledges saying this, but viewed it as necessary because his father was "defenseless" at the time.[25]  He denies coming toward his mother at all, and certainly not in a threatening way.[26]

### E. Tensions escalate between Bruce and Mrs. Tigani

Although the relationship between Bruce and Mrs. Tigani already was strained by other factors before April 2010, the confrontation at the hospital was the "turning point," leading to a drastic deterioration of their relationship.[27]  A number of other incidents in the months after April 2010 only served to deepen the divide.

A few weeks after the April 2010 hospital confrontation, Mrs. Tigani hosted a Mother's Day celebration at her home.  Bruce did not attend, believing he was not welcome, but his daughter, Jessica, and most other members of the family attended.  Jessica felt unwelcome when she arrived.[28]  She soon joined Jim, Jimmy, and others in the family room.  When someone in the group inquired about the score of the Phillies' game, Jessica put the game on the television.[29]  Shortly thereafter, Mrs. Tigani entered the room and asked who had changed the channel. When Jessica took responsibility, Mrs. Tigani angrily told her she was

---

[24] *Id*. at 41 (Bruce); Dep. of Diane Tigani at 169-70.
[25] Tr. at 41-42 (Bruce).
[26] *Id*. at 42. (Bruce).
[27] Tr. at 1067 (Jim); Dep. of Diane Tigani at 169.
[28] Tr. at 371 (Jessica).
[29] *Id*. at 372 (Jessica); Jimmy Dep. at 14.

disrespectful and, if she wanted to watch TV, she could leave.[30] When no one came to her defense, Jessica left the house.[31] Jimmy testified that this was not particularly unusual behavior for Mrs. Tigani, who not infrequently becomes confrontational at family gatherings.[32] Before this occasion, however, Jessica and Mrs. Tigani had enjoyed a particularly close relationship.[33]

The following month, the Tigani family again gathered at Mr. and Mrs. Tigani's home to celebrate Father's Day. This time, Bruce, Jessica, and B.J. attended, along with Diane, Jim, and most of Jim's children. Bruce and Mrs. Tigani largely kept their distance at the beginning of the celebration, but Jessica attempted to ease the tension with Mrs. Tigani by offering her a glass of water when she came in from the garden looking flushed.[34] Mrs. Tigani responded by calling Jessica a "brat."[35] Shortly thereafter, Bruce confronted Jim and Jimmy, asking why they had not defended Jessica on Mother's Day.[36]

At this point, most of the family was gathered in the same room, including Mr. and Mrs. Tigani. In the midst of the confrontation, Mrs. Tigani raised an issue about which she and Bruce previously had clashed: whether he would come over early on Sunday mornings to assist his father with bathing so Mrs. Tigani and

---

[30] Tr. at 372-73 (Jessica); Jimmy Dep. at 14-15.
[31] Tr. at 372-73 (Jessica).
[32] Jimmy Dep. at 15-16.
[33] Tr. at 28; (Bruce); *id*. at 360 (Jessica).
[34] *Id*. at 374-75 (Jessica).
[35] *Id*. at 375 (Jessica); *id.* at 641-42 (Mrs. Tigani); *id.* at 1146-47 (Diane).
[36] *Id*. at 53-54 (Bruce); *id*. at 377-78 (Jessica); Tr. at 1071 (Jim); Jimmy Deposition at 20-21.

Diane could attend Mass.[37] For understandable reasons, Mr. Tigani did not want his daughter or granddaughters to help him with bathing.[38] Bruce previously had indicated Sundays were the only day he had an opportunity to sleep in and had suggested he help his father later in the day.[39] Mrs. Tigani insisted that was not an option. What is unclear to an outside observer – and largely irrelevant to the case – is why neither Mrs. Tigani nor Bruce was willing to alter their typical schedules to accommodate the other's needs. There also is nothing I found in the record to suggest why Jim could not assist with this task. Each of the parties tries to paint the other as unreasonable and unyielding, when in fact they each fit the description, at least as to this issue.

Already upset by his mother's treatment of Jessica, Bruce was frustrated by his mother raising the Sunday morning issue, which he interpreted as Mrs. Tigani implying that he did not love his father and would not participate in his care.[40] What came next is the subject of some dispute. Bruce contends that he largely did not speak to his mother during the Father's Day confrontation and that he was focused on asking Jim and Diane why they had not defended Jessica from Mrs. Tigani's attacks.[41] Bruce vehemently denies that he physically threatened his

---

[37] Tr. at 49-51 (Bruce); *id.* at 645-47 (Mrs. Tigani).
[38] *Id*. at 645-46 (Mrs. Tigani).
[39] *Id*. at 50-51 (Bruce).
[40] *Id*. at 51 (Bruce).
[41] *Id*. at 53-55 (Bruce).

mother in any way.[42]  Jessica, B.J., and Jimmy agree with this account, although Jimmy does recall Bruce yelling at Mrs. Tigani and Diane.[43]

Mrs. Tigani, on the other hand, testified that Bruce was yelling profanities at her, came toward her with his fists, and was "within inches of [her] head."[44]  Mrs. Tigani claims she ducked out of the way just as Jim grabbed Bruce to restrain him.[45]  According to Mrs. Tigani, Bruce then turned to Diane and told her that when Mr. and Mrs. Tigani passed away, he (Bruce) would not help or assist Diane in any way.[46]  Mrs. Tigani testified Mr. Tigani witnessed, and was distraught and angered by, Bruce's treatment of both Mrs. Tigani and Diane.[47]  Jim's and Diane's trial testimony largely agreed with Mrs. Tigani's account, particularly on the disputed issues of what Mrs. Tigani said to Bruce, whether Bruce moved toward Mrs. Tigani when he became angry with her, whether he raised his hand toward her, and what Mr. Tigani witnessed.[48]  Jim's deposition testimony on those topics was not entirely consistent:  during his deposition, Jim did not recall Mrs. Tigani's request and could not recall whether his father was in the room during the confrontation,[49] while at trial Jim was certain about Mrs. Tigani asking Bruce to

---

[42] Tr. at 55-57 (Bruce).
[43] Tr. at 379-80 (Jessica); *id*. at 401-04 (B.J.); Jimmy Dep. at 50-52, 54-57.
[44] Tr. at 647-48 (Mrs. Tigani).
[45] *Id*. at 648 (Mrs. Tigani).
[46] *Id*.at 650-51 (Mrs. Tigani).
[47] *Id*. at 650-652 (Mrs. Tigani).  *See id.* at 1070-71 (Jim), 1149-50 (Diane).
[48] *Id*. at 1069-71 (Jim); *id.* at 1148-50 (Diane).
[49] Dep. of James V. Tigani, III at 60-62.

come over on Sunday mornings and recalled his father responding with disbelief and fear to Bruce's reaction to his mother.[50]

It is not necessarily material to the outcome of the case to determine beyond a shadow of a doubt what happened that day. What is more notable is that Bruce and Mrs. Tigani have very different stories about the confrontation and precipitating events, and there are witnesses that agree with the key points in both versions. Having heard live testimony from all the witnesses, other than Jimmy, who only testified by deposition, I find it more likely than not that: (1) Bruce became upset with his brother and sister for not standing up for Jessica, (2) Mrs. Tigani inserted herself into the argument and raised an issue she likely knew would only further provoke Bruce, (3) Bruce yelled profanities at his mother and also spoke harshly to his sister, and (4) Mr. Tigani was present to witness all of these interactions. I am doubtful that Bruce raised his hand as though to hit his mother. That incident, which I refer to herein as the "Father's Day Incident," was one of the key moments in the deterioration of Bruce's relationship with the rest of the family.

Later that summer, events involving Mr. Tigani's various business interests necessitated a meeting between Bruce and Mr. Tigani. Mrs. Tigani insisted that,

---

[50] Tr. at 1069-72.

Jim attend as well for her protection.[51] The need for Jim's presence delayed the meeting until evening, by which time Mr. Tigani was tired.[52] Bruce also felt Mrs. Tigani interfered with the meeting by injecting her views, which further complicated matters.[53] In the end, Mr. Tigani and Bruce were unable to reach a final decision, which hampered Bruce's efforts representing Mr. Tigani's interests at a business meeting the next day.[54]

Because Bruce felt Mrs. Tigani was restricting his access to his father – by virtue of her near-constant presence with Mr. Tigani and her refusal to be in the same place with Bruce without someone to protect her from him – Bruce concluded he no longer could represent his father effectively. Bruce therefore wrote his father a letter explaining his decision to withdraw as counsel.[55] Mr. Tigani was angry about Bruce's decision and insisted that Bruce continue to represent him. Jim tried to serve as intermediary between Bruce and Mr. Tigani, and, for a time, it appeared that Bruce might resume representing Mr. Tigani. The attempted reconciliation went nowhere, however, because Mrs. Tigani continued to insert herself into the process, and the strained relationship between Bruce and Mrs. Tigani made being together unworkable. Mr. Tigani ultimately retained

---

[51] *Id*. at 654 (Mrs. Tigani).
[52] *Id*. at 58-60 (Bruce).
[53] *Id*. at 60-63 (Bruce).
[54] *Id*. at 63-64 (Bruce).
[55] PX 43.

Emmanuel Fournaris, Esquire, to represent Mr. Tigani in connection with his business interests.

**F. The Tiganis reconsider their estate plans**

In connection with that representation, Mr. Fournaris suggested that one of his partners, Peter Gordon, Esquire, meet with Mr. and Mrs. Tigani to review their estate plans. The suggestion was not wholly surprising. In 1995, Mr. Gordon assisted the Tiganis with their estate plans, and in 2009 Mr. Gordon and Bruce had discussed the need for Mr. and Mrs. Tigani to revisit their planning.[56] Mr. and Mrs. Tigani met with Mr. Gordon on September 30, 2010. Diane also was present, although she did not participate aside from responding to Mr. Gordon's questions. In a file memorandum recording the salient points of their discussion, Mr. Gordon indicated that both Mr. and Mrs. Tigani stated unequivocally that they wanted to remove Bruce from the will.[57] Mrs. Tigani dilated at length on her reasons for disinheriting Bruce. During the meeting, Mrs. Tigani criticized Bruce for not helping his parents after Mr. Tigani's illness and explained that she believed his personal choices – particularly relating to his divorce and his relationship with Jennifer – were immoral and harmful to his children.[58] Mr. Tigani did not explain

---

[56] PX 12.
[57] Respondent's Exhibit ("RX 6").
[58] *Id*.

his reasons, perhaps because he had difficulty talking due to his health issues,[59] but Mr. Gordon's memo indicates Mr. Tigani was decisive about disinheriting Bruce.[60]

At the conclusion of the meeting, Mr. and Mrs. Tigani instructed Mr. Gordon to leave the bulk of their estate to Diane and Jim, with ten percent to be held in trust for Jessica and B.J.[61] The following day, however, Mrs. Tigani called Mr. Gordon and indicated that they changed their mind about leaving anything to Jessica and B.J.[62] Mr. Gordon prepared the requested documents, but Mr. and Mrs. Tigani did not receive them until March 2011, at least in part because Mr. Tigani fell ill again in or around October 2010, and Mrs. Tigani told Mr. Gordon's office that they would address the documents "later."[63]

Mr. Tigani was hospitalized in November 2010 for some complications relating to his illness. Bruce was not informed of the hospitalization until Jim told Bruce approximately a week later. Bruce went to visit his father the following day, along with Bruce's good friend, Frank Behm.[64] For much of the visit, Mr. Tigani was pleasant and talkative. After some time, however, Mr. Tigani received two phone calls in relatively short succession.[65] Mr. Tigani's demeanor then changed, and he told Mr. Behm that Bruce was being disinherited and that both Bruce and

---

[59] *Id*. at 1.
[60] *Id*. at 1, 4.
[61] *Id*.
[62] RX 7.
[63] PX 16.
[64] Tr. at 98-99 (Bruce).
[65] *Id*. at 99-100 (Bruce).

Mr. Behm should leave.[66]  Bruce believes that the phone calls were from Diane and that Mr. Tigani said these things in order to hurry Bruce and Mr. Behm out of the room.[67]  Diane testified, however, that the phone calls were ones she made simply to make sure it was a convenient time to visit her father, and that she did not know Bruce was visiting until she arrived at the hospital and her father told her about the visit and rather proudly related what he had said about Bruce being disinherited.[68]

### G. A thawing in the tensions

Between January and April 2011, there was little contact between Bruce and his parents.  In January, Jim told Bruce that Mr. Tigani wanted Bruce to resume his position as counsel, and Bruce went to Mr. and Mrs. Tigani's home in an attempt to meet and discuss that prospect.  After no more than an hour, Bruce ended the meeting because he felt Mrs. Tigani's interjections and interruptions were making the situation untenable.[69]  In March, Mrs. Tigani and Bruce exchanged unproductive letters in which both stated their position regarding what the other had misperceived or misunderstood.[70]  It was during this period that Mr. and Mrs. Tigani received from Mr. Gordon drafts of their revised wills and revocable trust

---

[66] *Id*. at 428-30 (Behm).
[67] *Id*. at 100-101 (Bruce).
[68] Diane Deposition at 196-200.
[69] Tr. at 102-05 (Bruce).
[70] PX 17, 21.

agreements.[71] Mrs. Tigani promptly sent Mr. Gordon a letter with questions regarding the drafts.[72]

In late April 2011, Mr. Tigani again was hospitalized and the doctors discovered he had colon cancer. Bruce was not informed of the hospitalization until at least a week later, when Jim called Bruce because Mr. Tigani was in respiratory distress and Jim was concerned the end was near.[73] Bruce immediately went to the hospital, at which point he and Mr. Tigani reconciled.[74] Until Mr. Tigani died that fall, Bruce frequently visited his father, and he and Mrs. Tigani put their disagreements aside for a time.[75]

In October 2011, approximately a week before Mr. Tigani died, Mr. Gordon sent Mr. and Mrs. Tigani revised drafts of their estate planning documents. The accompanying letter from Mr. Gordon explained the changes and expressed some hesitation regarding the tax consequences of various changes Mr. and Mrs. Tigani had requested.[76] Mrs. Tigani contacted Mr. Gordon after receiving those drafts and indicated that she wanted to change the disposition of assets in the drafts so that

---

[71] PX 19, 20.
[72] PX 23.
[73] Tr. at 109-110 (Bruce).
[74] *Id*. at 109-111 (Bruce).
[75] *Id*. at 110-111; *id*. at 688 (Mrs. Tigani).
[76] PX 24.

Bruce would receive one-third of the "business interests" upon Mrs. Tigani's death.[77]

**H. Mrs. Tigani revises her estate plan**

On October 23, 2011, Mr. Tigani died, having never revised his will or trust agreement. Upon Mr. Tigani's death, Mrs. Tigani became the successor trustee of the Trust and the executrix of Mr. Tigani's estate. Under the Trust Agreement, Mrs. Tigani is entitled to all the income from the Trust during her lifetime and may invade the principal of the trust as she deems necessary or advisable for her health, maintenance, and support.[78] Under the Trust Agreement, Mrs. Tigani also has a limited testamentary power of appointment (the "Power of Appointment") that allows her to designate beneficiaries of the Trust. The Power of Appointment is "limited" in the sense that the class of potential beneficiaries to whom property may be appointed is restricted to Mr. Tigani's issue who survive Mrs. Tigani. The Power of Appointment is "testamentary" because it only may be exercised in Mrs. Tigani's will. Specifically, the Power of Appointment provides, in pertinent part:

> (3) <u>Limited Testamentary Power</u>. Upon the death of the Settlor's spouse, the Trustee shall distribute such portions or all of the principal of the Residuary Trust to, or in trust for the benefit of[,] the descendants of the Settlor who survive the Settlor's spouse, in such manner as the Settlor's spouse may appoint and direct by her Last

---

[77] PX 25.

[78] PX 1 at Article FIRST (D)(1)-(2). The Trust created a marital trust and a residuary trust. As I understand it, only the Residuary Trust is at issue in this case, because it is all that will remain once Mr. Tigani's estate is settled. *See* Resp't's Opening Br. in Supp. of Mot. to Dismiss at 2.

Will and Testament admitted to probate specifically referring to this limited power of appointment. … In no event, shall the power of appointment conferred upon the Settlor's spouse in this subsection be construed as a power in the Settlor's spouse to appoint property in favor of herself, her creditors, her estate or the creditors of her estate.[79]

If Mrs. Tigani does not exercise the Power of Appointment, the Trust Agreement directs the Residuary Trust to be divided between Diane, Jim, and Bruce. In other words, Diane, Jim, and Bruce are the "default" remainder beneficiaries of the Trust.

The day after Mr. Tigani's death, Mrs. Tigani executed a last will and testament (the "2011 Will") and the "First Complete Amendment" to Mrs. Tigani's Trust ("the 2011 Trust Amendment"). In the 2011 Will, Mrs. Tigani purported to exercise the Power of Appointment by directing the trustee of the Trust to distribute all the trust assets subject to the Power of Appointment to the trustee of Mrs. Tigani's Trust, to be administered and distributed in accordance with the agreement governing Mrs. Tigani's Trust.[80] Mrs. Tigani simultaneously amended her trust agreement to distribute: (i) her tangible personal property between Diane and Jim, (ii) her real estate solely to Diane, and (iii) any "Business Interests" in equal shares to Diane, Jim, and Bruce.[81] Any remaining trust assets were to be distributed in designated percentages to Diane and Jim. In other words, Mrs.

---

[79] PX 1 at Article FIRST, D(3).
[80] PX 2 at Article SECOND.
[81] PX 4 at Article First, B (1)-(2).

20

Tigani did not entirely disinherit Bruce through the 2011 Trust Amendment, but she limited his interest to one-third of the "Business Interests" held by the Trust at the time of her death.[82] Mrs. Tigani apparently had this change of heart regarding disinheriting Bruce shortly before Mr. Tigani's death.[83] Bruce points out that Mrs. Tigani misunderstood the effect of this language and believed that Bruce would receive one-third of the value of the Business Interests in the event some or all were sold before her death.[84] Mrs. Tigani insists this was the legal effect of the October 2011 testamentary documents, although her attorneys advised her otherwise.[85]

A week after Mr. Tigani's death, Mrs. Tigani's attorneys contacted Bruce to discuss Mrs. Tigani's decision to "put him back" in "the will" for a portion of the business interests.[86] In response, Bruce requested information regarding Mr. Tigani's estate plans and any changes thereto in the last two years.[87] Acerbic e-mail exchanges, particularly those from Bruce, ensued.[88] A few months later, Bruce and his counsel met with attorneys representing Mrs. Tigani. During that

---

[82] "Business Interests" was defined to include any direct or indirect interest in Standard Distributing Co., Inc., Wesley Realty Co., JVT Holdings, LLC, or their successors. PX 4 at 5.

[83] PX 26 at BWT00039-40.

[84] Tr. at 824 (Mrs. Tigani).

[85] PX 29 at 2.

[86] PX 26 at BWT00039-41. This language about putting Bruce "back" in the will, which frequently was employed by Mrs. Tigani and her counsel, is imprecise and incorrect, as Bruce never was removed from his parents' wills before 2012.

[87] *Id*. at BWT00040-41; PX 27; PX 31; PX 38.

[88] *See, e.g.* PX 26, 27.

discussion, Bruce became angry and called his mother an offensive word.[89]
Apparently operating under a belief that their ethical obligations required them to
do so, Mrs. Tigani's attorneys reported that insult to her.

The negotiations and discussions between Bruce, Mrs. Tigani, and their
representatives were unsuccessful. Bruce filed this action on March 20, 2012,
seeking to remove Mrs. Tigani as executrix of Mr. Tigani's estate and trustee of
the Trust and requesting an accounting of her administration of the estate and the
Trust (the "Petition"). Although the Petition initially was filed under seal, it
attracted the attention of the media, likely because of other recent high-profile
litigation involving another branch of the Tigani family and their businesses. The
local newspaper sought to unseal the Petition, and largely was successful in that
effort. A story then ran in the newspaper describing the family dispute. Whether
for that reason, or simply because the Petition was filed in the first instance, Mrs.
Tigani decided to completely disinherit Bruce.[90]

On April 9, 2012, Mrs. Tigani further amended her trust (the "April 2012
Amendment"). In that amendment, Mrs. Tigani altered the trust agreement to

---

[89] Tr. at 149 (Bruce), 693 (Mrs. Tigani), 1061 (Fournaris).
[90] There has been some suggestion in the briefing that Mrs. Tigani was driven to disinherit Bruce because of the publicity associated with this case. The record, however, indicates that she decided to disinherit him the moment he filed the lawsuit. PX 39.

22

completely remove Bruce or his issue as beneficiaries of Mrs. Tigani's trust.[91]  The

April 2012 Amendment also expressly provided:

> THIRTEENTH: <u>Disinheritance</u>.  Settlor directs that neither Settlor's son, Bruce W. Tigani, nor any of his issue, shall receive any part of Settlor's trust estate.  The Trustee shall distribute Settlor's trust estate as though Settlor's son, Bruce W. Tigani, predeceased Settlor without leaving issue surviving Settlor.[92]

Four days later, Mrs. Tigani filed her opening brief in support of her motion to dismiss the Petition.  In that motion, Mrs. Tigani argued that Bruce lacked standing to bring this action because he was only a "contingent beneficiary," in the sense that "his beneficial rights to the Trust estate do not vest until Mrs. Tigani's life estate terminates and her limited power of appointment lapses unexercised."[93]  Mrs. Tigani's opening brief did not mention the April 2012 Amendment and that issue therefore was not addressed in Bruce's answering brief.  In her reply brief, Mrs. Tigani for the first time raised the April 2012 Amendment as a further basis to support her standing argument.  Bruce was permitted to file a sur-reply in light of the newly raised material.

Even then, however, Mrs. Tigani's position and arguments continued to shift and the parties did not fully and squarely address the issue of whether the 2011 Will, exercising the Power of Appointment, combined with the April 2012 Amendment to Mrs. Tigani's Trust, operated to divest Bruce of standing to pursue

---

[91] PX 3, Item I.
[92] *Id*., Item II.
[93] Resp't's Opening Br. in Supp. of Mot. to Dimiss at 3.

23

this action. In the sur-reply, Bruce also argued that the inclusion of materials outside the pleadings converted the motion to dismiss into a motion for summary judgment, and that discovery first should be permitted before the Court ruled on a motion for summary judgment. Among other things, Bruce argued he was entitled to take discovery into Mrs. Tigani's capacity to execute the 2011 Will and the April 2012 Amendment.

After hearing argument from the parties, I issued a draft oral report recommending that the Court deny the motion to dismiss. I stayed the period for taking exceptions and instructed the parties to take limited discovery regarding the 2011 Will and the April 2012 Amendment, including Mrs. Tigani's capacity to execute those documents. I further indicated I would resolve the legal question regarding Bruce's standing once the parties had completed limited discovery and briefed the precise questions raised by the standing issue.

After that hearing, Mrs. Tigani further amended her estate plan in July 2012 in an undisguised effort to eliminate any question regarding Bruce's standing. On July 31, 2012, Mrs. Tigani signed a codicil to her 2011 Will (the "July 2012 Codicil"). In that document, Mrs. Tigani "irrevocably" exercised the Power of Appointment and directed that the assets in the Trust should be distributed upon Mrs. Tigani's death in equal shares to Diane and Jim.[94] The July 2012 Codicil

---

[94] PX 5, Item two.

further states that "no property subject to the Limited Powers of Appointment I am now irrevocably exercising shall be distributed to my son, Bruce W. Tigani, or any of his issue."[95] Finally, Mrs. Tigani clarified her intent in executing the codicil:

> ITEM FOUR: I intend this Codicil to be irrevocable and I direct that this Codicil shall be construed to be a contract under seal to make a Will in accordance with 6 Del. C. § 2715 between myself, my son, James V. Tigani, III, and my daughter, Diane Amelia Tigani, in exchange for their continued love and affection and promise to assist me with my care and maintenance for the remainder of my lifetime.[96]

Jim and Diane also signed an "acceptance" of the codicil, indicating that they agreed to "jointly and severally continue to assist their mother with her care and maintenance for the remainder of her lifetime."[97]

## I. The parties' experts

Each side submitted expert testimony and opinions regarding Mrs. Tigani's capacity to execute the challenged estate documents. In a nutshell, Bruce's experts concluded Mrs. Tigani does not have testamentary capacity, either because she suffers from delusions regarding Bruce or because she is incapable of exercising thought, reflection, and judgment when it comes to her relationship with Bruce. Mrs. Tigani's experts, on the other hand, concluded she does have testamentary capacity and what Bruce's experts characterize as delusions are little more than differences of opinions or memories of certain events and relationships. Because

---

[95] *Id.*, Item three.
[96] *Id.*, Item four.
[97] *Id.* at 3-4.

there was no dispute regarding the experts' impressive credentials or their qualifications to render an opinion in this matter, I will not further discuss their backgrounds here, except to note that all four experts are distinguished and experienced.

Bruce's experts, Dr. Samuel Romirosky and Dr. Robin Belcher-Timme (collectively, "Bruce's experts") each had an opportunity to interview Mrs. Tigani in a clinical setting and conduct psychological testing, which was administered by Dr. Belcher-Timme. Bruce's experts issued a joint report dated March 30, 2014 (the "Petitioner's First Report") along with an addendum dated July 29, 2014 (the "Addendum"). The Addendum addressed the expert reports submitted by Mrs. Tigani's experts, and also provided Bruce's experts' revised conclusions reached after reviewing additional records and depositions that became available after Petitioner's First Report was issued.[98]

Mrs. Tigani reported to Bruce's experts that she had a happy childhood and was close with her siblings, parents, and grandparents growing up.[99] She similarly reported that she had a happy marriage, despite some ups and downs she and Mr. Tigani experienced in the nearly 67 years they were married. Drs. Romirowsky and Belcher-Timme reported that Mrs. Tigani spoke negatively about Bruce and his relationship with his father, which she characterized as little more than an

---

[98] PX 97 at 1-2, 5-6.
[99] RX 26 at 2.

attorney-client relationship.[100] Bruce – and by extension his experts – contends that all three of these claims are demonstrably false, pointing out that Mrs. Tigani's description of her childhood ignores the strained relationship with her siblings and is not consistent with Bruce's recollections of Mrs. Tigani's relationship with her family during his childhood. Bruce similarly points out documented incidents of Mrs. Tigani badgering or harassing Mr. Tigani, including an incident at a nursing facility shortly before he died. Bruce also correctly argues that Mrs. Tigani's minimization of Bruce's relationship with Mr. Tigani is not consistent with any other testimony or evidence in the record.

Bruce's experts make much of these "inconsistencies" or "distortions."[101] They also find it significant that Mrs. Tigani insisted there was never an occasion when one of her doctors could not find a physiological reason for a physical problem she was experiencing, even though her medical records indicate multiple occasions in which the treating physician could find no basis for Mrs. Tigani's ailments and referred her for psychological treatment for her well-documented anxiety.[102] The doctors went on to list a number of "distortions and possible

---

[100] RX 26 at 3. Although Mrs. Tigani denies making these statements, I have no reason to doubt the experts' recollection or credibility.

[101] *Id*. at 4.

[102] *Id*. at 6. Bruce, and at times even Bruce's experts, appeared to attach substantial significance to the fact that Mrs. Tigani's doctors suggested counseling or medication to help her anxiety. This stigmatization of, and overemphasis on, mental health issues is not persuasive, particularly where – as here – the problems Mrs. Tigani was facing have no discernable connection with her alleged lack of capacity. Rather, the repeated references to the fact that Mrs. Tigani had been

delusional beliefs," other than those listed above, including that Bruce wanted to "steal" the business from his parents and that Bruce's letter withdrawing as counsel to Mr. Tigani reflected his abandonment of his father.[103]

In the view of Bruce's experts, these "distortions," combined with the results of a Personality Assessment Inventory ("PAI") administered to Mrs. Tigani, amount to sufficient evidence to conclude "to a reasonable degree of psychological certainty, that [Mrs.] Tigani firmly and intractably holds irrational perceptions about her son, Bruce, as well as irrational perceptions of events in her life."[104] Although they could not diagnose her with a specific disorder, other than Generalized Anxiety Disorder, Drs. Romirowsky and Belcher-Timme concluded that Mrs. Tigani had "features"[105] of Delusional Disorder, Paranoid Personality Disorder, and Narcissistic Personality Disorder, all of which are cited as support for the doctors' conclusion that Mrs. Tigani "has a history of significant psychiatric symptomatology that materially and specifically, with regard to unsupported beliefs about Bruce Tigani, affected her capacity to create or amend her will."[106]

---

referred for treatment for her anxiety takes on the appearance that Bruce and his experts are grasping at any "weakness" they might exploit to demonstrate a lack of capacity. Similarly, the fact that Mrs. Tigani could not perfectly recall every referral given to her or every drug prescribed, is hardly noteworthy or indicative of a lack of capacity, particularly for a 90 year old woman who has some mild memory impairment. *See* RX 26 at 9.

[103] RX 26 at 11-12.
[104] *Id*. at 13.
[105] *Id*. at 14. By "features," the doctors mean that Mrs. Tigani has some symptoms of the listed disorders, but not enough to make a formal diagnosis. *Id*. at 13.
[106] *Id*. at 13-14.

Oddly, in the Addendum, Drs. Romirowsky and Belcher-Timme retreated from any suggestion that they had diagnosed Mrs. Tigani with delusions or delusional behavior, instead insisting that their conclusions regarding Mrs. Tigani's capacity were based on the severity of her "cognitive instability, rigidity of thinking, and repeated position reversals."[107] Strangely, references to cognitive instability and repeated position reversals are not apparent from my reading of Petitioner's First Report, further suggesting that Bruce's experts, being unable to definitively diagnose Mrs. Tigani with any pertinent mental condition, instead cobbled together "features" of various disorders into a vague conclusion that she lacked capacity. Unfortunately, the trial testimony did nothing to bring clarity to the doctors' conclusions.[108] The testimony, combined with the uncertain tone and diagnosis in Bruce's experts' reports, left me unable confidently to rely on the doctors' conclusions regarding Mrs. Tigani's capacity.

Mrs. Tigani hired her own experts, Dr. Frank M. Dattilio and Dr. Robert L. Sadoff, to opine as to her capacity. Drs. Datillio and Sadoff also interviewed Mrs. Tigani, Dr. Dattilio conducted additional "psychodiagnostic" testing, and Dr. Sadoff reviewed the results of that testing and Dr. Belcher-Timme's testing.

---

[107] PX 97 at 2, 5.

[108] Dr. Belcher-Timme did not testify at trial, and Dr. Romiroswky's testimony was confusing or confused. *See, e.g.* Tr. at 229-30, 870 (Romirowsky) (testifying inconsistently about whether he had diagnosed Mrs. Tigani with delusions), 873-75 (Romirowsky) (testifying inconsistently about whether Mrs. Tigani suffered from distortions, misrepresentations, or delusions), 876-80 (Romirowsky) (testifying that Mrs. Tigani met all the criteria for delusional disorder but refusing to say he had diagnosed her with delusional disorder).

During her interview with Dr. Datillio, Mrs. Tigani again described her upbringing in glowing terms and concluded hers was a happy marriage, despite some rough patches.[109] Dr. Dattilo noted references in Mrs. Tigani's medical records to some depression and anxiety she experienced and some prescriptions for medication and counseling to treat those issues. Mrs. Tigani acknowledged those facts to Dr. Dattilio and explained that she did not react well to the medication and did not continue counseling beyond four or five sessions.[110] Dr. Datillio concluded that Mrs. Tigani meets the criteria for a diagnosis of Generalized Anxiety Disorder, but he concluded she had no dementia-related deterioration and exhibited admirable cognitive function for someone her age.[111]

Dr. Datillio disagreed with the conclusions reached by Bruce's experts and particularly criticized their interpretation of the results of the PAI. Dr. Datillio explained that Bruce's experts failed to account for Mrs. Tigani's age when interpreting the results of the PAI, and therefore compared her responses to the entire sample set, rather than to the age range in which she fell. Because only 1.9 percent of the sample size was 65 or older, the use of the "boilerplate" scoring mechanism, as opposed to one scaled to Mrs. Tigani's age, distorted her responses and made some of her results appear unusual, when they in fact were typical of

---

[109] RX 28 at 4, 7.
[110] *Id*. at 13.
[111] *Id*. at 12.

people within her age bracket.[112] Significantly, Drs. Romirowsky and Belcher-Timme did not respond to this criticism in their Addendum.

Dr. Datillio concluded that there was "a clear lack of evidence to support the notion of any serious psychopathology" and that there was not sufficient evidence that Mrs. Tigani was paranoid or had the capacity for distortion or gross misrepresentation that Bruce's experts described in their report.[113] Dr. Datillio did not find anything to substantiate allegations that Mrs. Tigani suffers from a delusional belief system or otherwise could be diagnosed as having delusions.[114] Dr. Datillio therefore concluded that Mrs. Tigani had the requisite capacity to make and change her will.[115]

Dr. Sadoff issued two reports regarding Mrs. Tigani's capacity:  one in December 2012 and one in May 2014.[116] During her initial interview with Dr. Sadoff, Mrs. Tigani expressed sadness regarding the rift in her relationship with Bruce.[117] After meeting with Mrs. Tigani and interviewing her lawyers and Diane, Dr. Sadoff concluded in 2012 that Mrs. Tigani was "clearly competent to manage her affairs and to have signed the [2011 Will, the 2011 Trust Amendment, the

---

[112] *Id.* at 14-15.
[113] *Id.* at 15-16.
[114] *Id.* at 16.
[115] RX 28 at 20.
[116] RX 21, 31.
[117] RX 21 at 4, 7-8.

April 2012 Amendment, and the July 2012 Codicil]."[118] Dr. Sadoff reasoned that Mrs. Tigani did not have an irrevocable bias against Bruce because she expressed a willingness to reconcile with him if he apologized for his actions.[119]

Dr. Sadoff interviewed Mrs. Tigani again in 2014 and ordered psychological testing for Mrs. Tigani. In his 2014 report, Dr. Sadoff confirmed his conclusion that there was no evidence Mrs. Tigani is impaired intellectually or cognitively, and no evidence that she has "insane delusions" about Bruce.[120] Dr. Sadoff explained that a delusion is a "fixed false belief that cannot be influenced to change by logic or by reason or by influence."[121] He disagreed with Drs. Romirowsky and Belcher-Timme's conclusion that Mrs. Tigani had delusions, explaining that the fact that Mrs. Tigani had different opinions about people's relationships or different interpretations about events or individuals' motives did not rise to the level of an insane delusion. He similarly opined that Mrs. Tigani's characterization of her marriage and childhood as "happy," notwithstanding evidence that she had conflicts with her husband or her siblings, was simply a decision to focus on happy times and remember people – most of whom are deceased – in the best light.[122] Dr. Sadoff also strongly criticized Bruce's experts for attributing to Mrs. Tigani symptoms of certain disorders – such as Paranoid

---

[118] *Id*. at 7.
[119] *Id*. at 7-8.
[120] RX 31 at 1.
[121] *Id*. at 2.
[122] *Id*. at 3-4.

Personality Disorder or Narcissistic Personality Disorder – when they had concluded she could not be diagnosed with those disorders.[123]

Mrs. Tigani provided explanations to both Dr. Dattilio and Dr. Sadoff regarding her reasons for disinheriting Bruce. She indicated to Dr. Datillio that she and Mr. Tigani decided to remove Bruce as a beneficiary of their estates after he withdrew as his father's counsel, acted violently toward Mrs. Tigani, and had what they considered an immoral relationship with Jennifer.[124] To Dr. Sadoff, Mrs. Tigani described more generally the bases for her anger with Bruce, relating some incidents that occurred when he was in college, his decision to allow Jennifer to sleep in his home when the children were present, the Father's Day incident, and Bruce's decision to withdraw as counsel to Mr. Tigani.[125]

Both of Mrs. Tigani's experts testified at trial, and I found the testimony of both to be credible and consistent with their written reports. Their testimony and their reports also coincided with my own observations of Mrs. Tigani, who during her testimony appeared to be: (1) remarkably sharp for a woman of her age, (2) unquestionably strong-willed and firm in her beliefs about various people, and (3) rather unforgiving of others' faults, but (4) far from delusional as I understand that term. Perhaps most notably, Dr. Sadoff succinctly explained at trial that a person's

---

[123] *Id*. at 5-6.
[124] RX 28 at 17.
[125] RX 21 at 3-4; RX 31 at 2.

thinking cannot be characterized as "delusional," notwithstanding evidence contradicting that thinking, if there is a "scintilla" of evidence that supports the allegedly delusional person's beliefs.[126]

## J. The parties' positions in this litigation

After the evidentiary hearing on capacity, Mrs. Tigani filed a motion for summary judgment resurrecting her standing argument. The parties simultaneously briefed and argued the capacity issue and the standing issue. In her motion for summary judgment, Mrs. Tigani argues that both the April 2012 Amendment and the July 2012 Codicil operate independently to divest Bruce of standing to pursue this action because he no longer is a beneficiary of Mr. Tigani's Trust. Mrs. Tigani's argument is premised on her position that the July 2012 Codicil[127] was both a "release" and a contract to exercise a power of appointment and that Delaware law should recognize a contract to exercise a power of appointment as effective when the contract is signed, in contrast to the settled rule that a testamentary power of appointment is not effectively exercised until the donee dies. Bruce, on the other hand, argues that he is a vested beneficiary subject to divestiture by virtue of his position as a taker in default of the Power of

---

[126] Tr. at 582-84 (Sadoff).

[127] Although Mrs. Tigani took the position at oral argument that the April 2012 Amendment also effectively divested Bruce of standing because it was a "release," her briefs in support of the motion for summary judgment focus almost exclusively on the July 2012 Codicil. In any event, because I conclude that the July 2012 Codicil does not divest Bruce of standing, the April 2012 Amendment is similarly ineffective in removing Bruce as a party with standing to challenge Mrs. Tigani's actions as trustee and executrix.

Appointment, and that none of Mrs. Tigani's efforts to remove him as a beneficiary of the Trust are presently effective or can be effective until her death.

Bruce also argues that, even if the July 2012 Codicil or April 2012 Amendment divested him of standing in this action, Mrs. Tigani lacked capacity at the time she executed those documents. Bruce contends that Mrs. Tigani has fixed, false beliefs regarding Bruce, such that she is unable to "alter her unusually rigid thoughts even when presented with overwhelming evidence to the contrary."[128] As Bruce frames his argument, Mrs. Tigani's delusional beliefs were so overwhelming that – at the time she executed the challenged documents – she was unable to exercise thought, reflection, and judgment regarding her relationship with Bruce. Bruce further contends that the conclusions of Dr. Sadoff and Dr. Datillio regarding Mrs. Tigani's capacity are based on those experts' beliefs that Bruce's experts were untruthful or inaccurate in reporting Mrs. Tigani's statements during her clinical interviews.

Mrs. Tigani, of course, contends that she had and has capacity to make and change her will and estate plan and that Bruce's argument conflates the "thought, reflection, and judgment" standard for capacity with the standard for insane delusions under Delaware law. Mrs. Tigani argues that Bruce grossly understates the standard necessary for the Court to conclude a testator lacks capacity as a result

---

[128] Pet'r's Opening Post-Tr. Br. at 67.

of insane delusions, and that what Bruce identifies as "delusions" are little more than differences in the parties' opinions or recollections regarding various events or relationships.

**ANALYSIS**

I begin my analysis by discussing whether Mrs. Tigani's various estate planning efforts after this lawsuit was filed were sufficient to divest Bruce of standing to continue this action. For the reasons that follow, I conclude they do not. The question of whether Mrs. Tigani had the requisite capacity to execute those documents therefore is moot. For the sake of efficient judicial review, however, and because of the likelihood the issue of capacity will be raised at some later date if not addressed now, I then discuss my conclusions regarding capacity. As discussed below, I believe Mrs. Tigani had capacity to execute the challenged documents.

I. **Bruce has standing to maintain this action because Mrs. Tigani's testamentary power of appointment cannot effectively be exercised until her death.**

Delaware law permits a "beneficiary" to bring an action to remove a trustee of a trust.[129] The term "beneficiary" is undefined in the relevant chapter of the Delaware Code and the parties therefore spent a fair amount of time at the motion to dismiss stage arguing whether a contingent beneficiary fell within the meaning

---

[129] 12 *Del. C.* § 3327.

of "beneficiary" under 12 *Del. C.* § 3327. It is not necessary for this Court to resolve that argument because Bruce is not a contingent beneficiary, but rather a vested beneficiary subject to divestiture, and I believe that the statute's use of the general term beneficiary, without any language restricting the class of beneficiary to whom it refers, fairly encompasses a vested beneficiary subject to divestiture.

Mrs. Tigani's argument that Bruce is a contingent beneficiary rests on her contention that her death and failure to appoint Bruce's share to other permissible appointees was a condition precedent to Bruce receiving a share of the Trust. Mrs. Tigani did not cite any precedent for that position in her summary judgment briefs.[130] In contrast to that argument, both the Restatement (Second) of Property and a leading treatise on trust law indicate that a taker in default of a power of

---

[130] In her motion to dismiss, Mrs. Tigani cited a decision of the U.S. Tax Court, *Estate of Halpern v. C.I.R.*, 1995 WL 447972 (Tax Ct. July 31, 1995) and a decision of this Court, *N.K.S. Distributors, Inc. v. Tigani*, 2010 WL 2011603 (Del. Ch. May 7, 2010). In *Halpern*, the Tax Court did describe as "contingent" the interests of beneficiaries who would receive the trust corpus if the donee of a power of appointment failed to exercise that power. The Court's use of the term "contingent," however, appears to be dicta, as it did not form the basis for the Court's ruling. 1995 WL 447972 at *10. In addition, the Court's opinion does not indicate that it was charged with distinguishing between a contingent beneficiary and one who was vested subject to divestiture. In *N.K.S. Distributors* the Court was presented with the question of whether a successor beneficiary of a trust could compel the production of attorney-client communications between the primary beneficiary and counsel to the trust. The Court denied the motion and reasoned that the movant only was a "contingent beneficiary" because the primary beneficiary had a limited power of appointment and there was no guarantee the movant would remain as a beneficiary under the power of appointment. 2010 WL 2011603 at *2. The opinion in *N.K.S. Distributors* does not indicate whether the movant was a taker in default of the power of appointment, and therefore is of limited utility in resolving the question of Bruce's legal status.

appointment is classified as vested subject to divestiture.[131]  More importantly, regardless of how the interest held by a taker in default of a power of appointment is described, most courts in other jurisdictions have concluded that a taker in default has an interest in the property that is the subject of the power of appointment and has standing to compel an accounting from a trustee.[132]  Mrs. Tigani has not identified any reason why Delaware should deviate from this majority rule.  In fact, there is good reason to follow that trend, particularly in this case, because concluding that the takers in default of the Power of Appointment do not have standing to challenge the actions of the trustee effectively would insulate Mrs. Tigani from any form of judicial review of her actions as trustee.

The analysis, unfortunately, does not end there, because Mrs. Tigani contends that, even if Bruce had standing at the time he filed this action, the July 2012 Codicil divested him of standing.  The parties agree there is no Delaware case directly on point.  In my view, however, persuasive authority from other jurisdictions, along with several secondary sources, including the Restatement, compel the conclusion that:  (1) Mrs. Tigani's attempt to exercise the Power of

---

[131] Restatement (2nd) Property:  Donative Transfers § 11.2, cmt. c. ("A taker in default of appointment has an interest in the property that is subject to the power of appointment.  If the only thing that can defeat the interest is an exercise of the power, the interest in the taker in default is vested subject to divestiture."); Alan Newman, George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees § 967 at 178 n.26 (3d ed. 2010) (citing Restatement (Second) Property: Donative Transfers § 11.2, cmt. c.).

[132] *See* Alan Newman, George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees § 967 at 178-79 n.26 (3d ed. 2010) (citing cases).

Appointment is not effective during her lifetime; (2) the July 2012 Codicil at most represents a "release" of Mrs. Tigani's power to appoint the Trust property to Bruce, but it does not alter his position as a taker in default of the Power of Appointment; and (3) Delaware law does not, and should not, recognize a "contract to exercise a power of appointment" as a presently-enforceable agreement.

## A. The Power of Appointment is not presently exercisable.

There is no dispute between the parties that the Power of Appointment is a testamentary power, as it only may be exercised in Mrs. Tigani's last will and testament admitted to probate.[133] In turn, Mrs. Tigani necessarily must be deceased before any exercise of the Power of Appointment is effective, since her last will and testament cannot be admitted to probate while she is living. For that reason, Delaware law and several secondary sources provide that any exercise of a testamentary power of appointment becomes effective only at the death of the powerholder,[134] who often is called the "donee" of the power.[135] It is settled that any bequests Mrs. Tigani might make in her will of property she owns would not pass to the named beneficiaries until her death, because her will might be changed

---

[133] *In re Estate of James Vincent Tigani, Jr.*, C.A. No. 7339-ML at 4-5 (June 2, 2015) (TRANSCRIPT).

[134] *Weymouth v. Wilmington Trust Co.*, 1991 WL 148808, at *4 (Del. Ch. Aug. 2, 1991); Uniform Powers of Appointment Act (hereinafter cited as "UPAA") § 102(15)(B); Restatement (Second) of Property: Donative Transfers § 11.5.

[135] The Restatement (Second) of Property: Donative Transfers § 11.2 contains definitions identifying the various persons related to a power of appointment.

or the property might be transferred during her lifetime.[136] Similarly, any appointees Mrs. Tigani might designate in her last will and testament to become beneficiaries of the Trust could not claim an interest in the property until her death, because the power of appointment does not become exercisable until that time.

**B. Although the July 2012 Codicil may be a release, it does not alter Bruce's position as a taker in default of a power of appointment.**

Although Mrs. Tigani concedes the Power of Appointment is not presently exercisable, she contends the July 2012 Codicil operated as both a release[137] and a contract to exercise a power of appointment, and the combination of those two things effectively eliminated Bruce as a beneficiary – whether contingent or vested – under the Trust.

Delaware law expressly permits the donee of a power of appointment to release the power either partially or completely. Nearly any power of appointment, including the Power of Appointment at issue here, is "releasable," with or without consideration, if the release is made in a signed writing and delivered as required

---

[136] *Hill v. Baker*, 102 A.2d 923, 926-27 (Del. Super. 1953).

[137] It is notable that Mrs. Tigani's argument that the July 2012 Codicil operates as a "release" was not even raised until her reply in support of her motion for summary judgment. That is, Mrs. Tigani filed four briefs on the standing issue (two in support of the motion to dismiss and two in support of the motion for summary judgment) and did not contend until the last brief that her intent was to "release" Bruce as a permissible appointee. Bruce argues, correctly I believe, that this constitutes "sandbagging," which generally is not countenanced in the Delaware courts. Because Mrs. Tigani does not prevail on the merits of the release argument, however, I have considered the issue rather than concluding that the argument was waived by the failure to timely raise it.

by law.[138] The release is effective upon delivery of the signed writing to, among others, "any person, other than the grantee, who could be adversely affected by an exercise of the power."[139] There is no requirement under the law that any party adversely affected by the release be a party to, or consent to, the release.[140]

A release, however, does not alter the persons a trustor designated as takers in default of a power of appointment. Rather, at most, a release of a power of appointment limits or eliminates the donee's power to appoint.[141] Arguably, the July 2012 Codicil may be read as a partial release or as a contract to release, given Mrs. Tigani's direction that no property that was the subject of the Power of Appointment would be distributed to Bruce.[142] If it is a valid release, the July 2012 Codicil limited Mrs. Tigani's Power of Appointment by reducing the class of permissible appointees of the power. The inquiry, however, does not end there.

---

[138] 25 *Del. C.* § 502(a); *see also* Restatement (Second) Property: Donative Transfers § 14.2.
[139] 25 *Del. C.* § 502(c)(3).
[140] *See, e.g.* 25 Del. C. § 502; Restatement (Second) Property: Donative Transfers § 14.3; Restatement (Third) Property: Wills and Other Donative Transfers § 20.3.
[141] Restatement (Second) Property: Donative Transfers § 14.2, cmt. c ("A non-general power to appoint by will cannot be exercised in the donee's lifetime. A complete release of such a power causes the interests of the takers in default of appointment to be incapable of being defeated by an exercise of the power."); *id.* § 16.2, cmt. a ("A release, however, operates negatively by eliminating possible appointees."); Restatement (Third) Property: Wills & Donative Transfers § 21.2, cmt. a (same).
[142] I say "arguably" because there is some authority to support the opposite conclusion. That is, as discussed below, a contract to appoint may be construed as a release, but if the donee benefits from the contract, the contract may not be valid and enforceable and the release therefore may not be effective. *See* Restatement (Third) Property: Wills & Donative Transfers § 20.3, cmt. d. Because I conclude that, even if effective as a release, the July 2012 Codicil would not eliminate Bruce's standing, I need not reach the hypothetical question of whether the July 2012 Codicil is a valid release.

Mrs. Tigani might choose not to exercise the Power of Appointment, or might fail to exercise it correctly, in which case Bruce would be a beneficiary of the Trust as a taker in default of the Power of Appointment. For that reason, Mrs. Tigani also argues that the July 2012 Codicil functions as a contract to exercise the Power of Appointment.[143]

### C. A contract to exercise a testamentary power of appointment is not valid in Delaware.

Mrs. Tigani argues that the July 2012 Codicil operated as a contract to exercise the Power of Appointment in favor of Jim and Diane, effectively eliminating the possibility that Bruce would take in default of the Power of Appointment. The question of whether a so-called "contract to appoint" is valid in Delaware appears to be an issue of first impression. In my view, the better rule, and the one adopted by the Restatement, is that a donee who holds a power to

---

[143] At argument, Mrs. Tigani acknowledged that, even if the release was valid, it did not alter Bruce's status as a taker in default, but contended that any remaining interest Bruce might have is so attenuated that the Court should not recognize it as conferring standing on Bruce to maintain this action. *In re Estate of James Vincent Tigani, Jr.*, C.A. No. 7339-ML (June 2, 2015) (TRANSCRIPT) at 43-45. In support of that argument, Mrs. Tigani cited the *N.K.S. Distributors, Inc. v. Tigani*, 2010 WL 2011603 (Del. Ch. May 7, 2010), discussed at footnote 130, *supra*. As explained above, the utility of that case is limited here because in that case it is not clear whether the movant was a taker in default, as opposed to merely a permissible appointee. More importantly, the issue the Court confronted was whether a "contingent" beneficiary should be permitted to obtain privileged documents when the primary beneficiary of the trust was opposed to the documents being produced. The Court in that case was not presented with the more fundamental question of whether a "contingent" beneficiary should have standing to pursue an accounting. Other courts that have addressed that question have concluded that beneficiaries similarly situated to Bruce have standing. *See* n. 132, *supra*.

appoint that is not presently exercisable, such as the one at issue here, may not enter into a valid contract to appoint.

From the outset, it is helpful to keep in mind the distinction between a release and a power of appointment. A release operates negatively, by limiting or altogether eliminating a donee's power of appointment. A contract to appoint, on the other hand, operates affirmatively as a purported exercise of the power.[144] A donee of a power of appointment expressly is permitted to release the power under Delaware law.[145] The Restatement similarly recognizes the validity of a release.[146] Delaware law is silent, however, with respect to contracts to appoint. The Restatement and other secondary sources generally indicate that contracts to exercise a testamentary power of appointment are not valid, with limited exceptions.

The Restatement explains that "a contract to exercise a power that is not presently exercisable is unenforceable" unless "the donee was also the donor of the power and reserved the power in a revocable inter vivos trust."[147] There are two rationales underlying that rule. First, a donee of a power not presently exercisable, such as a testamentary power of appointment, does not have the authority to make a present appointment. Allowing the donee to circumvent that rule through a

---

[144] *See* Restatement (Third) Property: Wills & Donative Transfers § 21.2, cmt. a.

[145] 25 *Del. C.* § 502.

[146] *See, e.g.* Restatement (Second) Property: Donative Transfers §§ 14.2, 14.3; Restatement (Third) Property: Wills and Donative Transfers § 20.3.

[147] Restatement (Third) Property: Wills & Donative Transfers § 21.2.

contract to appoint would defeat the donor's intent in creating a power that could not be exercised immediately.[148] A donor who creates a testamentary power of appointment, or any other power not presently exercisable, is presumed to intend that "the selection of the appointees and the determination of the interests they are to receive is to be made in light of the circumstances that exist on the date the power becomes exercisable."[149] In other words, by limiting when a power of appointment may be exercised, the donor essentially requires the donee to "wait and see" and take into account later developing facts before exercising the power.

Applied to this case, when Mr. Tigani gave Mrs. Tigani a testamentary power of appointment, he is presumed to have intended that she would have the freedom to exercise the power after taking into account all facts and circumstances that developed between Mr. Tigani's death and Mrs. Tigani's death. If the Court were to recognize the contract to appoint as valid, Mrs. Tigani's ability to alter the appointment at any time before her death would be eliminated and Mr. Tigani's intent would be defeated. Other sources are in accord with this reasoning.[150] Although Delaware law is silent on this precise issue, it is settled that the scope of a power of appointment is interpreted pursuant to the donor's intent.[151]

---

[148] Restatement (Third) Property: Wills & Donative Transfers § 21.2, cmt. a.

[149] *Id*. § 21.2, cmt. a.

[150] UPAA § 406 (2013); John A. Burron, Jr., The Law of Future Interests, §§ 874, 1011 (3d ed.). The relevant sections of the UPAA and The Law of Future Interests may be found as exhibits to the letter to the Court from Thomas R. Riggs, Esq., dated June 4, 2015.

[151] *Weymouth v. Wilmington Trust Co.*, 1991 WL 148808, at *3 (Del. Ch. Aug. 2, 1991).

Second, a contract to appoint that confers a benefit on a donee when the donee is not a permissible appointee also is invalid on the independent ground that [the contract] confers a benefit on an impermissible appointee. As this Court explained in *Weymouth v. Wilmington Trust Co.*, a power of appointment may not be exercised in a manner that would benefit an impermissible appointee.[152] Such an appointment is considered a "fraud" on the power and is invalid.[153] Mrs. Tigani is not a permissible appointee under the Power of Attorney. She nonetheless conferred a benefit upon herself by contracting to exercise the Power of Appointment in exchange for Diane's and Jim's "continued love and affection and promise to assist [her] with [her] care and maintenance for the remainder of [her] lifetime."[154] For that reason, if Delaware follows the Restatement and the other secondary sources, the July 2012 Codicil is ineffective as a contract to appoint both because it contravenes Mr. Tigani's intent and because it confers a benefit on Mrs. Tigani, who is not a permissible appointee.

Mrs. Tigani argues, however, that Delaware should not follow the Restatement regarding the validity of contracts to appoint, either as a general rule or at a minimum in this particular case. Mrs. Tigani acknowledges that Delaware

---

[152] *Id*. at *3-4.

[153] UPAA § 307. There need not be any actual fraud involved in a fraudulent appointment. Rather, an attempt to exercise the power is fraudulent and void if it is exercised for a purpose or with an intention beyond the scope of the power. The Law of Future Interests, *supra* n. 150, § 981 at 547; *see also*, *id.* at § 1011 at 570.

[154] PX 5 at Item 4.

courts generally find the Restatement of Laws to be persuasive authority on many topics,[155] but contends the rule announced in the Restatement should not apply here because it conflicts with Delaware's recognition of the enforceability of contracts to make a will. Mrs. Tigani also argues, in the alternative, that the July 2012 Codicil should be valid because it was not contrary to Mr. Tigani's intent and because Mr. Tigani surely would have wanted Mrs. Tigani to have the freedom to use the Power of Appointment to ensure the continued support of her children in her old age.

As to the first argument, the fact that Delaware recognizes and enforces contracts to make a will, provided the burden of proof of such an agreement is met,[156] is not a sufficient basis to conclude that Delaware also should recognize contracts to appoint. There are important distinctions to be drawn between the two contracts. First, unlike a contract to appoint, a contract to make a will does not involve the same policy concerns of contravening a donor's intent. Second, a contract to make a will does not allow the would-be testator to use as consideration an interest in property to which he otherwise has no right. By entering into a contract to make a will, a testator agrees to make a bequest of a property interest

---

[155] *See, e.g. Stayton v. Del. Health Corp.*, 117 A.3d 521 (Del. 2015); *Ascension Insur. Holdings, LLC v. Underwood*, 2015 WL 356002 (Del. Ch. Jan 28, 2015); *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647 (Del. Ch. Nov. 17, 2014); *In re Activision Blizzard, Inc.*, 86 A.3d 531 (Del. Ch. 2014).

[156] *See* 6 *Del. C.* § 2715; *Brown v. Wiltbank, II*, 2011 WL 5027057, at *5 (Del. Ch. Oct. 13, 2011); *In re Maull*, 1994 WL 374302, at *3 (Del. Ch. June 9, 1994).

that belongs to the testator and of which the testator freely may dispose during his lifetime. In contrast, the property in question in a contract to exercise a testamentary power involves a property interest to which the donee has no claim and which the donee cannot dispose of during her lifetime.[157] Put another way, if a contract to appoint were enforceable, the donee could use the contract to confer a current benefit on herself in exchange for property – the remainder interest – the donee has no right to enjoy. Mrs. Tigani has a life estate in the income and principal of the Trust. She has a power to appoint the remainder interest to a set of permissible appointees, but she has no right herself to enjoy the remainder interest.

Mrs. Tigani's argument that she has not contravened Mr. Tigani's intent or conferred a benefit on herself that he did not intend is equally unpersuasive in my view. To determine a settlor's intent, this Court looks to the language in the trust. If that language is unambiguous, the Court looks no further and does not consider extrinsic evidence of intent.[158] Mrs. Tigani does not point to any ambiguity in the language of the Trust, but instead argues that Mr. Tigani could not have intended to limit her authority in this way because it was their agreement as spouses that the last survivor would control the ultimate disposition of their joint assets. Mrs. Tigani posits that Mr. Tigani likely did not understand the precise implications of the type of power of appointment contained in the Trust Agreement. The Court,

---

[157] *Accord* The Law of Future Interests, *supra* n. 150, § 1013 at 572.
[158] *Wilmington Trust v. Annan*, 531 A.2d 1209, 1211 (Del. Ch. 1978).

however, cannot look to extrinsic evidence to read ambiguity into an unambiguous contract. Mr. Tigani's Trust plainly states that the Power of Appointment was testamentary, evincing his intent that Mrs. Tigani could not exercise the power until her death. Additionally, Mr. Tigani named the permissible appointees of the Power of Appointment, of which Mrs. Tigani was not one. In fact, there likely were important tax reasons that Mrs. Tigani was not named as a permissible appointee of the power. Because the language in the agreement is unambiguous, Mrs. Tigani cannot resort to her own testimony regarding the spouses' understanding or what Mr. Tigani may or may not have understood when he signed the agreement.

For those reasons, I conclude that – even if the July 2012 Codicil was an effective release of Mrs. Tigani's power – it did not divest Bruce of standing as a taker in default of the power, and the portion of the July 2012 Codicil that purported to operate as a contract to exercise the Power of Appointment is void under Delaware law. Bruce therefore continues to have standing as a taker in default to pursue this action.

**D. The Power of Appointment is exclusionary.**

Finally, although it is not necessary to reach the issue in light of the foregoing conclusion, I nevertheless will address Bruce's alternate argument that the Power of Appointment is non-exclusionary. Given the current tensions

between the parties, it seems unlikely that a détente may be reached, in which case the issue of whether the Power of Appointment is exclusionary or non-exclusionary is likely to arise upon Mrs. Tigani's death. Briefly, Bruce argues that, even if the July 2012 Codicil were both a release and a valid contract to appoint, the exercise of the Power of Appointment would be invalid because he contends the Power of Appointment is non-exclusionary, meaning Mrs. Tigani must appoint a minimum reasonable share to each of the permissible appointees. In contrast, an exclusionary power of appointment allows the donee to select among a class of permissible appointees, excluding some of the permissible appointees altogether.

There is no case or statute in Delaware addressing the distinction between exclusionary and non-exclusionary powers of appointment. A handful of states have adopted statutes to the effect that all powers of appointment are exclusionary.[159] Others follow the rule, adopted in the Restatement, that a power of appointment is presumed to be exclusionary unless the terms of the power expressly provide that the appointment must benefit each permissible appointee.[160] The Restatement explains that language that unambiguously creates a non-exclusionary power includes language "granting the donee the power to appoint to 'all and every one' or to 'each and every one' of a defined and limited class of permissible appointees, or language specifying the share of the appointive property

---

[159] The Law of Future Interests, *supra* n. 150, § 982 at 552 & n.5.
[160] Restatement (Third) Property: Wills & Donative Transfers § 17.5.

from which one or more individually designated permissible appointees may not be excluded by an appointment."[161]  Bruce concedes that the Power of Appointment does not contain any such language.

In my view, the plain language of the Power of Appointment indicates it is exclusionary because it allows Mrs. Tigani to distribute "such portions or all" of the residue of the trust to Mr. Tigani's descendants who survive Mrs. Tigani, "in such manner as [Mrs. Tigani] may appoint and direct … ."[162]  By allowing Mrs. Tigani to appoint some or all of the residue to the permissible appointees in such manner as she directed, Mr. Tigani selected unambiguous language indicating an intent to allow Mrs. Tigani to decide which of the permissible appointees received an interest, and in what amount.  That conclusion also is supported by the absence of any language in the Trust from which a reviewing court could determine the minimum share each permissible appointee would receive if the power were non-exclusionary.[163]  In any event, even if the Power of Appointment was ambiguous, the Restatement indicates that ambiguous language is presumed to create an exclusionary power.[164]

---

[161] *Id.* § 17.5, cmt. d.

[162] PX 1 at 13.

[163] *See* <u>The Law of Future Interests</u>, *supra* n. 150 at § 982 at 552 (discussing the difficulty in determining whether a minimum share was "nominal," and therefore illusory, or "substantial," and therefore valid).

[164] Restatement (Third) Property: Wills & Donative Transfers § 17.5, cmt. f ("[F]or example, a power to appoint 'to,' 'among,' or 'between' a defined and limited class of permissible appointees is exclusionary.").

**II.     Mrs. Tigani had capacity at the time she executed the 2011 Will, the 2011 Trust Amendment, the April 2012 Amendment, and the July 2012 Codicil.**

As explained above, having concluded that Mrs. Tigani's recent estate planning could not divest Bruce of standing while she is still alive, the issue of Mrs. Tigani's capacity is moot. It nonetheless is likely that, if the Court does not resolve capacity now, that challenge will be re-raised at a later date. I therefore discuss the capacity issue below.

The standard for testamentary capacity in Delaware is well-worn: "[O]ne who makes a will must, at the time of execution, be capable of exercising thought, reflection and judgment, and must know what he is doing and how he is disposing of his property. He must have sufficient memory and understanding to comprehend the nature and character of his act."[165] A testator is presumed to have capacity, and the burden rests on the contesting party to prove incapacity by a preponderance of the evidence.[166] If a person meets this standard, it is irrelevant whether the Court agrees with the testator's plan of distribution.[167]

A sound mind is one that is "wholly free from delusion."[168] Conversely, a delusion is the mark of an unsound mind, and a delusion that directly influences a

---

[165] *In re Will of Langmeier*, 466 A.2d 386, 402 (Del. Ch. 1983); *see also*, *In re Estate of West*, 522 A.2d 1256, 1263 (Del. Ch. 1987).

[166] *In re Will of Langmeier*, 466 A.2d at 389; *In re Barnes' Will*, 18 A.2d 433, 434 (Del. Super. 1941); *In re Miller's Will*, 85 A. 803, 808 (Del. Super. 1912).

[167] *In re Miller's Will*, 85 A. at 808.

[168] *Rodney v. Burton*, 86 A. 826, 829 (Del. Super. 1912).

person's will necessarily invalidates that will.[169]  Under Delaware law, a delusion is "a false belief for which there is no reasonable foundation, a conception of the existence of something which does not exist, of which the mind of the person entertaining it cannot permanently be disabused."[170]  A delusion may be limited to particular subjects, such that a testator otherwise appears to be of completely sound mind.[171]  Nonetheless, if that partial delusion forms the basis for a testator's decisions, it deprives the testator of capacity.

The question that must be answered by a court determining the capacity of an allegedly delusional testator is whether the testator suffered from such insane delusions, continuing up to the time of making her will, that she was not capable of exercising thought, reflection, and judgment and did not possess the requisite memory and understanding to comprehend the nature and character of her acts.[172] In *Tracy v. Prudential Life Insurance Co. of America*, this Court distilled the applicable law regarding insane delusions into a two-part test:

1.  Was the belief of the [testator] a mere false idea as distinguished from an insane delusion?

2.  Assuming such a delusion, did the [testator] change the beneficiaries [of the estate] because of that belief?[173]

---

[169] *Rodney*, 86 A. at 829-30; *In re Miller's Will*, 85 A. at 810-11.
[170] *In re Barnes' Will*, 18 A.2d at 434.
[171] *In re Miller's Will*, 85 A. at 810-11.
[172] *Id*. at 811.
[173] 101 A.2d 321, 326 (Del. Ch. 1953).

As explained above, Bruce contends that Mrs. Tigani suffers from delusional beliefs regarding Bruce, and that those delusions affected her thought, reflection, and judgment at the time she executed the challenged testamentary documents. Bruce lists several delusions he contends are overwhelmingly supported by the evidence, namely Mrs. Tigani's beliefs regarding: (1) her "happy" childhood, (2) her "happy" marriage, (3) the confrontation between Bruce and Mrs. Tigani in April 2010 at the hospital, (4) the confrontation between Jessica and Mrs. Tigani on Mother's Day, the (5) "Father's Day Incident," (6) Bruce's withdrawal letter, and (7) the legal effect of the 2011 Will and 2011 Trust Amendment.[174] As to Mrs. Tigani's beliefs or characterizations of her childhood and marriage, Bruce concedes those "delusions" did not affect Mrs. Tigani's decision to disinherit Bruce, but he contends they nevertheless are important because they provide evidence of how her "psychological issues" inform her view of the world.[175]

Importantly, each of the "delusions" Bruce identifies are not, as Delaware law requires, false beliefs for which there is no reasonable foundation. Rather, each of these five items reflects either (1) a difference in the parties' recollection and interpretation of various events or (2) a lay person's misunderstanding of nuanced legal issues. None of these items, nor the collective set, stands as proof by a preponderance of the evidence that Mrs. Tigani is delusional. It is clear that,

---

[174] *See* Pet'r's Opening Post-Tr. Br. at 67-82; Pet'r's Reply Post-Tr. Br. at 34-35.
[175] Pet'r's Reply Post-Tr. Br. at 34.

for a number of reasons, not the least of which is this lawsuit, Mrs. Tigani dislikes Bruce. It also is clear that she has misunderstood him on a number of occasions. Mistake and prejudice, however, are not insane delusions.[176]

The first three items Bruce identifies as delusions affecting Mrs. Tigani's testamentary decisions – the April 2010 hospital incident, the Mother's Day incident, and the Father's Day Incident – amount to little more than different peoples' interpretation and recollection of motivations and events. In an effort to prove Mrs. Tigani is delusional, Bruce focuses on items that are not material to Mrs. Tigani's testamentary decisions, such as her recollection of the temperature that day, the hospital in which the events occurred, and when a particular television program aired. Although Mrs. Tigani's insistence that she is correct on those points – despite demonstrable evidence to the contrary – is odd, those "delusions" did not factor into her decision to execute the challenged documents. The events that may have played a role in her decision to disinherit Bruce, such as whether he was justified in shouting at his mother in the hospital, or what occurred in the Tiganis' home during the holiday functions, are not incontrovertibly false. Rather, Mrs. Tigani's recollection is supported by others who witnessed the events. If there is even a modicum of facts upon which a testator might have based her belief,

---

[176] *In re Barnes' Will*, 18 A.2d at 434.

that belief is not an insane delusion, even if the Court concludes the testator's belief is without foundation or illogical.[177]

Bruce also characterizes as delusional Mrs. Tigani's insistence that Bruce abandoned his father by withdrawing as counsel and her unwavering belief that the 2011 Will gave Bruce one-third the value of the business interests, even if the businesses were sold before Mrs. Tigani's death. As to the first point, Bruce's argument focuses not on delusions, but on his belief that Mrs. Tigani misinformed Mr. Tigani about the contents of the withdrawal letter and that she "caused her husband to feel insulted and humiliated at his son's apparent rejection of him."[178] Even if that was the case, which other witnesses – including Jim and Diane – discount, those actions would not be evidence of a delusion. In addition, I believe Mrs. Tigani's insistence regarding the effect of the 2011 Will reflects not a delusion, but her position regarding what she *intended* the will to accomplish, although she did not achieve that intent.

Other statements of Mrs. Tigani to which Bruce has referred at times as "delusional," such as those regarding Mr. Tigani's feelings about Bruce, also do

---

[177] *Id.* Bruce suggests that Mrs. Tigani's version of events is supported only by people she likely manipulated into "remembering" key events consistent with her own recollection. Although I find it likely that Mrs. Tigani has a tendency to try to impose her view and recollection on people, I had an opportunity to observe the witnesses at trial and do not believe either Jim or Diane materially changed their stories to suit Mrs. Tigani's position in this lawsuit. In any event, if Mrs. Tigani was able to convince others that her version of events is accurate, that necessarily precludes any finding that Mrs. Tigani is delusional, because the people she most trusts are agreeing with her beliefs.

[178] Pet'r's Opening Br. at 74.

not rise to the standard required to prove lack of capacity under Delaware law. At various points, Mrs. Tigani made insulting or extreme statements to or about Bruce or his children, for which no foundation was offered, but she did not cling to those statements throughout this litigation. Particularly where, as here, a relationship between two people has deteriorated to a point of uncompromising dislike, a reviewing court must be careful to consider whether extreme statements one makes about the other actually are "delusions," or more likely are exaggerated statements of anger or loathing.[179]

In sum, Bruce has not proved by a preponderance of the evidence that Mrs. Tigani suffers from delusions that altered her capacity to make a will. It is plain that Mrs. Tigani dislikes Bruce, but it also is plain that she has ample reason to be angry with him, and he with her. None of that rises to a level that permits this Court to substitute its judgment for that of a testator. As this Court previously has explained: "The fact that [a] testator dislikes certain of the natural objects of his bounty does not establish an insane delusion; even if such dislike is groundless; and still less if such dislike is based upon some reason, although it may be an unjust one."[180]

---

[179] *See, e.g. Tracy.*, 101 A.2d at 326-27 (concluding that extreme statements made by the deceased regarding his wife from whom he was separated could be better explained by the broken relationship between the spouses than it could by reference to delusions).
[180] *Id*. at 327 (quoting 1 Page on Wills (Lifetime Ed.) § 146).

**CONCLUSION**

For the foregoing reasons, I recommend that the Court deny Mrs. Tigani's motion for summary judgment on the basis that, although she had testamentary capacity to execute the challenged documents in 2011 and 2012, those documents do not divest Bruce of standing to maintain this action. This is my final report and exceptions may be taken in accordance with Rule 144.